# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***People v. Hughes*, 2012 IL 112817**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JACKIE HUGHES, Appellant. |
| Docket No. | 112817 |
| Filed | November 29, 2012 |
| Rehearing denied | January 28, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A court did not err in denying a motion to withdraw a plea of guilty to aggravated criminal sexual abuse where, although it was alleged that neither court nor counsel advised defendant of the possibility of a statutory petition for civil commitment as sexually violent, the court had no due process duty to do so and the defendant failed to establish a sixth amendment violation by meeting his *Strickland* burden of showing ineffectiveness—no lack of jurisdiction to accept guilty plea to nol-prossed charge. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lake County, the Hon. Victoria Rossetti, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, State Appellate Defender, Thomas A. Lilien and Alan D. Goldberg, Deputy Defenders, and Darren E. Miller, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Elgin, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Michael A. Scodro, Solicitor General, and Michael M. Glick and Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), for the People.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justice Burke.

## OPINION

¶ 1        Defendant, Jackie Hughes, pleaded guilty to one count of aggravated criminal sexual abuse (720 ILCS 5/12-16 (West 2006)) and was sentenced to 14 years in prison. Defendant appealed from the denial of his motion to withdraw his plea, contending that the circuit court of Lake County lacked subject matter jurisdiction to entertain a plea to a previously nol-prossed charge, and that his plea was not knowingly and voluntarily made because the court and counsel failed to advise him of the possibility that the State would file a petition for involuntary commitment under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2006)). The appellate court affirmed. 2011 IL App (2d) 090992. For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                I. BACKGROUND

¶ 3        On August 11, 1999, a Lake County grand jury indicted defendant and charged him with five counts of predatory criminal sexual assault of a child (counts I, II, III, IV and X) (720 ILCS 5/12-14.1(a)(1) (West 1998)) and five counts of aggravated criminal sexual abuse (counts V through IX) (720 ILCS 5/12-16(c)(1)(I) (West 1998)). The allegations involved sexual contact with several minor victims arising at various times between 1995 and 1998. At the time of the indictment, defendant was also on probation for aggravated criminal sexual abuse involving a minor, which term was set to expire on August 24, 1999. As a result, the State also filed a petition to revoke defendant's probation in a separate proceeding.

¶ 4        On December 28, 1999, the circuit court granted the State leave to enter a *nolle prosequi* on counts I through IV and count VI of the indictment. The criminal charges remained pending on count V and counts VII through X of the indictment. Two days later, on December 30, 1999, the State instituted civil commitment proceedings, seeking to have

defendant declared a sexually dangerous person under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq.* (West 1998)). The remaining criminal charges in the indictment formed the basis for that petition.

¶ 5    On August 17, 2000, a jury found defendant to be a sexually dangerous person. The circuit court entered a judgment on the jury's finding and ordered defendant committed to the care and custody of the Director of Corrections pursuant to the Act. At that time, there was a discussion on the record regarding the status of the remaining pending criminal charges. The State informed the court that under the Act, upon discharge from the civil commitment, the pending charges in the indictment would be dismissed.

¶ 6    Thereafter, defendant timely appealed from his involuntary civil commitment. During the pendency of the appeal, on January 4, 2001, the circuit court entered an administrative order directing the clerk of the court to classify the criminal matter under the disposition code "administrative dismissal," due to defendant's civil commitment as a sexually dangerous person. Subsequently, the appellate court reversed the judgment and remanded the cause to the circuit court for a new commitment proceeding consistent with the evidentiary standards announced by this court in *People v. Masterson*, 207 Ill. 2d 305 (2003). *In re Detention of Hughes*, 346 Ill. App. 3d 637 (2004). On remand, the State chose not to proceed with a new civil commitment proceeding and, instead, chose to proceed with the criminal prosecution, entering into plea negotiations with defendant on the criminal charges. On September 26, 2006, at the plea conference, the State informed the court that "[p]art of our agreed disposition today here is that we're vacating that administrative order with whatever effect it had, so the indictment is back before the Court." As a result, the circuit court entered an "agreed" order vacating its prior order of January 4, 2001, "administratively" dismissing the pending criminal matter.

¶ 7    Under the terms of the fully negotiated plea agreement, defendant agreed to plead guilty to the offense of aggravated criminal sexual abuse of M.A., a minor, as charged in count VI of the indictment. In exchange, the State agreed to dismiss the remaining criminal charges, withdraw its petition to have defendant committed as a sexually dangerous person, and recommend an extended-term sentence of 14 years in prison. Presumably unaware of the previous 1999 dismissal of count VI, the State did not refile new charges or seek to have defendant reindicted on the previously nol-prossed count. Nor did the State file a motion to vacate the order of December 28, 1999, previously granting it leave to nol-pros count VI. Notably, count VI of the indictment was the only count alleging any sexual offense involving M.A.

¶ 8    Prior to accepting the plea, the court admonished defendant regarding his possible sentence, including that he was eligible for an extended-term sentence based on his prior conviction. Defendant was made aware that he would be subject to a four-year term of mandatory supervised release, which defendant indicated that he understood. The State presented a factual basis for the plea, stating that from about December 1998 through the summer of 1999, defendant was a house guest and babysitter in the Alvarez household. During the time he babysat for the Alvarez children, on at least one occasion, he fondled M.A.'s vagina for purposes of sexual gratification. M.A. was under 18 years old at that time. Defense counsel stipulated that there would be testimony to that effect from which a trier of

fact could find defendant guilty.

¶ 9    Following the State's presentation of a factual basis, the circuit court accepted defendant's guilty plea, entered judgment against defendant, and sentenced him in accordance with the plea agreement to 14 years' imprisonment with credit for time served since July 21, 1999. The court advised the parties that the good-time credit would have to be calculated by the Department of Corrections. The State withdrew its petition to have defendant committed as a sexually dangerous person. The record also reflects that defense counsel informed the court during the plea hearing that the previous day he had received a report dated September 19, 2006, from his expert, Dr. Robert Chapman, finding that defendant was not a sexually dangerous person. The State acknowledged receipt of that information and acknowledged that it was part of the State's consideration in the plea negotiations.

¶ 10    Two weeks later, on October 10, 2006, presumably based upon an evaluation of defendant's mental health condition, the Attorney General filed a petition to commit defendant as a sexually violent person under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2006)). The next day, defendant filed a motion to withdraw his guilty plea, alleging that he was never advised by the court or his counsel of the possibility that the State could file a sexually violent person petition as a result of the plea. Consequently, defendant maintained that he did not knowingly and voluntarily enter the plea.

¶ 11    At the hearing on the motion to withdraw the plea, defense counsel was granted leave to withdraw, and conflict counsel was appointed to represent defendant. Defense counsel testified that he conveyed to defendant his understanding of the plea agreement. Counsel understood that if defendant pled guilty to the one count, he would be sentenced to 14 years' imprisonment and the sexually dangerous person petition would be dismissed. Considering the amount of time he spent in custody, defendant would be sent to the penitentiary as a mere formality and would then be released, which would completely dispose of the whole matter. Counsel acknowledged that the court advised the parties that the good-time credit would have to be calculated by the Department of Corrections.

¶ 12    Defense counsel also testified that he previously worked for the Illinois Attorney General's office and was in charge of the Sexually Violent Persons Division for a year. As a result, he was aware that the Attorney General was responsible for initiating the proceedings under the Sexually Violent Persons Commitment Act and that the decision about whether a defendant qualified under the Act as a sexually violent person was determined by various experts' evaluations. During defense counsel's tenure, the State's Attorney would be notified and a joint decision was made whether to file the petition. Defense counsel further testified that he never discussed with defendant and did not anticipate the possibility that the State would subsequently file a petition to have defendant declared a sexually violent person. The issue was never raised with the State or the court.

¶ 13    Defendant testified that it was his understanding that if he pleaded guilty he would be sent to the penitentiary. Once his good-time credit was calculated for time served, he believed he would be going home and his plea would dispose of the matter. He further testified, contrary to his counsel, that he brought up and discussed with counsel not only the

-4-

sexually dangerous person petition, but also a sexually violent person petition. Defendant testified as follows:

"Q. And your attorney, *** didn't speak to you about any other [pending] cases, correct?

A. We had a discussion about an SVP as far as that goes.

Q. About what?

A. An SVP. I was bringing it up with him and we discussed it.

Q. Do you know the difference between an SVP and an SDP?

A. Not really, no.

Q. What was pending before the Court?

A. SDP.

Q. SDP. And now you are saying you had a discussion with [your attorney] about an SVP?

A. Yes.

Q. You just heard him testify, and he said there was no such discussion?

A. Well, outside the court, as far as I remember, we discussed something.

Q. You are sure?

A. Yes.

Q. And you are under oath, correct?

A. Yes."

¶ 14 Defendant then stated that he would not have pleaded guilty to the one count of aggravated criminal sexual abuse if he had known that the plea would not have disposed of the matter completely.

¶ 15 The circuit court denied the motion to withdraw the plea, finding that the plea was knowingly and voluntarily made. The court specifically found that the petition was filed by the Attorney General two weeks after the plea was entered into, and that there was no evidence in this case that the State's Attorney's office filed or had input into the filing of the petition. The court noted that defendant was advised of the nature of the charges, the possible penalties, and the right to trial. The court also noted that defendant indicated that he understood the basis for the plea and the terms of the negotiations.

¶ 16 On appeal, defendant raised two issues before the court. He argued that: (1) the plea was void because the State had previously nol-prossed the count to which he pleaded guilty and never sought to refile it; and (2) the plea was not knowingly and voluntarily made because he was never advised by the court or his counsel that the plea could be used as a basis for filing a petition to have him declared a sexually violent person, subject to involuntary commitment. The appellate court affirmed. 2011 IL App (2d) 090992. With respect to the first issue, the court found that although the court lacked jurisdiction over the nol-prossed charge, the parties revested the court with jurisdiction by their conduct at the plea hearing. *Id.* ¶¶ 7, 9-10. With respect to the second issue, the court found that traditionally, the filing of the sexually violent person petition was a collateral consequence of the plea and, therefore,

the circuit court did not have a duty to admonish defendant regarding the possibility that he could be subject to an involuntary civil commitment. *Id.* ¶ 16. The court further found that defendant failed to establish that the holding in *Padilla v. Kentucky*, 559 U.S. ___, 130 S. Ct. 1473 (2010), mandated a duty upon counsel to advise a defendant regarding the possibility of involuntary civil commitment as a consequence of his plea. *Id.* ¶ 22. Additionally, the court held that even if there was a duty, defendant had not established that counsel failed to fulfill his obligation or that defendant was prejudiced. *Id.* ¶ 20. Accordingly, the appellate court affirmed the circuit court's denial of defendant's motion to withdraw his plea. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 17                                    II. ANALYSIS

¶ 18                                    A. Jurisdiction

¶ 19       As a threshold matter, defendant contends that his plea is void because the circuit court lacked the requisite subject matter jurisdiction necessary to entertain a plea to the nol-prossed charge of aggravated criminal sexual abuse of M.A. Whether the trial court had jurisdiction of a count is a purely legal question and, therefore, our review is *de novo*. *In re Luis R.*, 239 Ill. 2d 295, 299 (2010).

¶ 20       "Jurisdiction is a fundamental prerequisite to a valid prosecution and conviction." *People v. Davis*, 156 Ill. 2d 149, 155 (1993). A court's subject matter jurisdiction relates to "the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). With exceptions not relevant here, the circuit court's subject matter jurisdiction is derived from the state constitution; *Id.*; Ill. Const. 1970, art. VI, § 9. The relevant Illinois constitutional provision provides:

> "Circuit Courts shall have original jurisdiction of all justiciable matters except when the Supreme Court has original and exclusive jurisdiction relating to redistricting of the General Assembly and to the ability of the Governor to serve or resume office. Circuit Courts shall have such power to review administrative action as provided by law." *Id.*

Thus, subject to the express exceptions, the circuit court has the power to determine all "justiciable matters" brought before it. *Id.* We have previously defined a "justiciable matter" to be generally "a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." *Belleville Toyota*, 199 Ill. 2d at 335; see also *Davis*, 156 Ill. 2d at 157 ("Our constitution confers upon the circuit courts a general grant of authority to hear and decide all matters of controversy.").

¶ 21       Here, it is undisputed that the sexual offenses originally alleged in the indictment fall within the general class of cases that the circuit court has the power to hear and determine under the Criminal Code of 1961, thereby invoking the circuit court's subject matter jurisdiction over a justiciable criminal matter. Rather, the specific question before us is whether the State's entry of a *nolle prosequi* on count VI divested the circuit court of its jurisdictional authority to entertain a subsequent plea on that charge.

¶ 22　　The Latin term *nolle prosequi* means "not to wish to prosecute." Black's Law Dictionary 1147 (9th ed. 2009). It is a procedural practice rooted in English common law dating back to the 1600s. *People ex rel. Hoyne v. Newcomer*, 284 Ill. 315, 320 (1918). We have previously explained that a *nolle prosequi* is the formal entry of record by the State which denotes its unwillingness to prosecute a charge. *People v. Artis*, 232 Ill. 2d 156, 169 (2009). A *nolle prosequi* may be entered as to an entire charging document, or as to one or more counts. 22A C.J.S. *Criminal Law* § 548 (2006).

¶ 23　　Once a charge is nol-prossed, the proceedings are terminated with respect to the particular charge, and the defendant is free to go " 'without entering into a recognizance to appear at any other time.' " *People v. Norris*, 214 Ill. 2d 92, 104 (2005) (quoting *People v. Watson*, 394 Ill. 177, 179 (1946)). A *nolle prosequi* is not an acquittal of the underlying conduct that served as the basis for the original charge but, rather, it leaves the matter in the same condition as before the prosecution commenced. *Id.* at 104. Thus, we have previously held that if a *nolle prosequi* is entered before jeopardy attaches, the State may reprosecute the defendant subject to other relevant statutory or constitutional defenses (see, *e.g.*, *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 102 (2004) (*nolle prosequi* "does not toll the statute of limitations")) and " 'absent a showing of harassment, bad faith, or fundamental unfairness.' " *Norris*, 214 Ill. 2d at 104 (quoting *People v. DeBlieck*, 181 Ill. App. 3d 600, 606 (1989)).

¶ 24　　The parties dispute what procedural steps the State may take in order to reprosecute a defendant on a nol-prossed charge. Defendant maintains that the State may only reprosecute a defendant by commencing a new proceeding and refiling a new charging instrument. The State maintains that it may either commence a new proceeding or may alternatively move to vacate the *nolle prosequi* order and reinstate the original charges prior to a final judgment. Defendant is correct that we have previously stated that a *nolle prosequi* order "requires the institution of a new and separate proceeding to prosecute the defendant." *Ferguson*, 213 Ill. 2d at 101; *People v. Woolsey*, 139 Ill. 2d 157, 168 (1990) ("the State must file a new charging instrument to reinstate its prosecution" (citing *Watson*, 394 Ill. at 179)); *People v. Gill*, 379 Ill. App. 3d 1000, 1007 (2008) ("the State was free to refile these [nol-prossed] charges (as it did) at any time before the applicable statute of limitations"). Nevertheless, these cases did not consider whether the State could alternatively move to vacate and reinstate an identical charge and under what circumstances.

¶ 25　　We addressed this particular issue long ago in *Watson*, 394 Ill. 177. There, the court considered whether the trial court had the authority to set aside, *i.e.*, vacate, the previous *nolle prosequi* order and reinstate a burglary charge. The court found vacating to be a proper exercise of the trial court's authority. Citing cases from other jurisdictions that had allowed this procedure, *Watson* recognized that the entry of the *nolle prosequi* does not deprive the court of its inherent authority " 'to vacate any judgment or order that may have been made at that term.' " *Id.* at 181 (quoting *State v. Lonon*, 56 S.W.2d 378, 380 (Mo. 1932)); see also *People v. DeBliek*, 181 Ill. App. 3d 600, 606 (1989) (recognizing *Watson*'s holding and stating, "If the dismissal was a *nolle prosequi*, the State could either refile the complaint or move to vacate the *nolle prosequi*, have the original charge reinstated, and proceed on the original charge."). We continue to recognize the validity of this procedure when done before

jeopardy attaches, prior to a final judgment, and in the absence of any applicable constitutional or statutory limitations which a defendant may raise.

¶ 26    In the present case, because the charges in count VI of the indictment were nol-prossed in December 1999, the State terminated the criminal prosecution with respect to that charge at that time. Where jeopardy had not yet attached, the State had the right to reprosecute or seek to vacate the dismissal and reinstate the charges alleging aggravated criminal sexual abuse of M.A. However, we reject the State's assertion that the court exercised its authority to reinstate the charge based on any motion to vacate or based on the parties' "agree[ment] to reinstate" count VI. Rather, the record reflects that in September 2006, the State was apparently unaware of the previous dismissal and consequently failed to avail itself of either procedure. Instead, the State presented the indictment to the court assuming that it included the charge related to M.A.

¶ 27    We must next determine whether the State's error here affected the jurisdiction of the court. We find this issue resolved by *People v. Benitez*, 169 Ill. 2d 245, 256 (1996). In *Benitez*, the defendant was never properly charged with an offense. The initial indictment failed to name him and the second indictment was not valid because the State failed to follow accepted methods for amending the indictment. *Id.* at 253-55. This court found that based on these facts the defendant was never properly charged with any crime, but rejected defendant's argument that the circuit court lacked jurisdiction and that his conviction was void. *Id.* at 255-56. Rather, this court held that under Illinois jurisprudence, jurisdiction "is not conferred by information or indictment, but rather by constitutional provisions. Accordingly, a charging instrument which fails to charge an offense does not deprive the circuit court of jurisdiction." *Id.* at 256.

¶ 28    Similarly here, there was an indictment before the court. The fact that the indictment under which defendant pled was defective in that it failed to charge the offense to which he pled did not divest the court of jurisdiction. "[T]he only consideration is whether the alleged claim falls within the general class of cases that the court has the inherent power to hear and determine." (Emphasis omitted.) *In re Luis R.*, 239 Ill. 2d at 301. Here, the State presented a justiciable matter involving aggravated criminal sexual abuse, an offense authorized under the Criminal Code. 720 ILCS 5/12-16 (West 2006); 720 ILCS 5/1-3 (West 2006) ("No conduct constitutes an offense unless it is described as an offense in this Code or in another statute of this State."). Accordingly, jurisdiction was present, whether or not the indictment was legally defective.

¶ 29    As defendant correctly notes, the Illinois Constitution provides that no person shall be held to answer for a crime punishable by death or imprisonment unless the charge has been brought by grand jury indictment or pursuant to a preliminary hearing. Ill. Const. 1970, art. I, § 7. However, that fundamental right is a personal privilege to be distinguished from the power of the court to adjudicate a controversy. See *Stafford*, 325 Ill. App. 3d at 1075 (holding defendant criminally liable based on a dismissed charge violated his due process right to receive notice of the charges and defend himself against those charges at trial). Thus, we have always held and continue to hold that a defendant has a right to challenge the sufficiency of a charging instrument for failing to state an offense based on statutory and due process grounds. However, a successful challenge would render the conviction voidable not

void for lack of jurisdiction. See *People v. Gilmore*, 63 Ill. 2d 23, 28-29 (1976). Here, defendant never asserted a challenge on this basis.

¶ 30    As this court has explained, " '[t]here are many rights belonging to litigants—rights which a court may not properly deny, and yet which if denied do not oust the jurisdiction or render the proceedings absolutely null and void.' " *Davis*, 156 Ill. 2d at 157 (quoting *Humphries v. District of Columbia*, 174 U.S. 190, 194 (1899)). Accordingly, the failure to refile the charging instrument or seek to vacate and reinstate the charge based on the same offense as previously charged in count VI of the indictment did not affect the power of the circuit court to hear and render a judgment on the plea.

¶ 31                          B. Voluntariness of the Plea

¶ 32    We next consider defendant's contention that the circuit court erred in denying his motion to withdraw his guilty plea because it was not knowing or voluntary. Generally, the decision to grant or deny a motion to withdraw a guilty plea rests in the sound discretion of the circuit court and, as such, is reviewed for abuse of discretion. *People v. Baez*, 241 Ill. 2d 44, 109-10 (2011). A defendant has no absolute right to withdraw his guilty plea. *Id.* at 110. Rather, he must show a manifest injustice under the facts involved. *Id.* Withdrawal is appropriate where the plea was entered through a misapprehension of the facts or of the law or where there is doubt as to the guilt of the accused and justice would be better served through a trial. *Id.*

¶ 33    Specifically, defendant argues that "neither the trial court nor defense counsel informed him of the possibility that he could be civilly committed for an indeterminate period of time if the State elected to file [a sexually violent person petition]" under the Act. These two assertions are premised upon two distinct constitutional requirements involving due process (*Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969)), and the sixth amendment right to counsel (*Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985); *People v. Correa*, 108 Ill. 2d 541, 549 (1985) (voluntariness of plea depends upon whether the defendant had effective assistance of counsel)). We address each in turn.

¶ 34                              1. *Due Process*

¶ 35    Generally, due process requires that in order for a defendant to knowingly and voluntarily plead guilty, a defendant must be advised of the direct consequences of a guilty plea. *People v. Delvillar*, 235 Ill. 2d 507, 520 (2009). As we have previously explained, a direct consequence of a guilty plea is one which has a definite, immediate and largely automatic effect on the range of a defendant's sentence. *People v. Williams*, 188 Ill. 2d 365, 372 (1999). A trial court's obligation to ensure that a defendant understands the direct consequences of his plea traditionally encompasses those consequences that affect the defendant's sentence and other punishment that the circuit court may impose. *Delvillar*, 235 Ill. 2d at 520.

¶ 36    In contrast, a defendant need not be advised by the trial court of the collateral consequences of a guilty plea. *Williams*, 188 Ill. 2d at 371. A collateral consequence is one which the circuit court has no authority to impose, and "results from an action that may or may not be taken by an agency that the trial court does not control." *Delvillar*, 235 Ill. 2d at

520. Examples of collateral consequences have included loss of employment, loss of voting rights, license suspension, and dishonorable discharge from the military. *Williams*, 188 Ill. 2d at 372. These types of consequences lack the definite, immediate or automatic effect on the sentence imposed. As such, we have held that the court is not in a position to advise on all of these types of consequences, which are so numerous and unforseeable, and that to require more of the court would place an unnecessary burden on it. *Id.* at 371-72. Whether a consequence of a guilty plea is direct or collateral is a question of law which we review *de novo*. *Id.*

¶ 37    The possibility of involuntary commitment under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2006)) does not flow directly and automatically from the conviction, and is not a consequence of a defendant's sentence that the trial court could impose. Initially, the proceedings under the Act are not penal, but rather civil, involving the long-term care and treatment of sexually violent persons. 725 ILCS 207/20, 40(a) (West 2006). Although a petition requires a prior predicate conviction for a sexual offense, that conviction, by itself, is not sufficient to trigger a petition for an involuntary commitment. 725 ILCS 207/15 (West 2006). Rather, a petition for commitment will depend on various procedures, including a comprehensive evaluation of a defendant's mental health condition to determine whether defendant is currently a "sexually violent person" as that term is defined under the Act. 725 ILCS 207/10(c)(2), 5(f) (West 2006).

¶ 38    Specifically, under the relevant provisions of the Act in existence at the time of defendant's plea, a sexually violent person is defined as "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2006). If the defendant "may meet the criteria for commitment as a sexually violent person," the agency with authority to release or discharge him is required to notify the Attorney General and the relevant State's Attorney "as soon as possible beginning 3 months prior to the applicable date of" the defendant's anticipated release from imprisonment. 725 ILCS 207/10(b)(1) (West 2006); *In re Detention of Samuelson*, 189 Ill. 2d 548, 553 (2000). As part of the notice, the agency provides "[a] comprehensive evaluation of the person's mental condition," the basis for the determination that the person is subject to commitment under the Act, and a recommendation for further action. 725 ILCS 207/10(c)(2) (West 2006). The evaluation is conducted according to the standards developed under the Sex Offender Management Board Act and by an evaluator approved by the Board. *Id.*

¶ 39    After the requisite notice is given by the agency, the Attorney General or, if the Attorney General elects not to proceed, the relevant State's Attorney may file a petition alleging that the defendant is a sexually violent person. 725 ILCS 207/15(a) (West 2006). Upon the filing of the petition, the court is then required to hold a hearing to determine whether there is probable cause to believe that the defendant is a sexually violent person. 725 ILCS 207/30(b) (West 2006). If probable cause is found, the matter then proceeds to a trial, where the State must prove beyond a reasonable doubt that the person is a "sexually violent person." 725 ILCS 207/35(d)(1) (West 2006). During that process, among other rights, defendant is afforded the right to counsel, the right to present and cross-examine witnesses, and the right

to a jury trial. 725 ILCS 207/25 (West 2006).

¶ 40    Thus, a defendant may be convicted of a predicate sexual offense, but may not be committed under the Act because the evidence is ultimately insufficient to find that the defendant's mental condition "makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2006). Accordingly, any potential civil commitment would not flow directly from his guilty plea but, rather, from a separate civil proceeding instituted by the State as a collateral consequence. As a result, prior to accepting a plea, the trial court is not obligated to advise a defendant of the possibility of involuntary civil commitment under the Act.

¶ 41    This conclusion is consistent with our own appellate court cases that have considered the trial court's obligations (*In re Detention of Lindsay*, 333 Ill. App. 3d 474, 477 (2002); *People v. Norris*, 328 Ill. App. 3d 994, 997 (2002)), and consistent with most other jurisdictions' treatment of the issue in the context of due process (see, *e.g.*, *Cuthrell v. Director, Patuxent Institution*, 475 F.2d 1364 (4th Cir. 1973); *People v. Harnett*, 894 N.Y.S.2d 614 (N.Y. App. Div. 2010); *Pearman v. State*, 764 So. 2d 739 (Fla. Dist. Ct. App. 2000); *Martin v. Reinstein*, 987 P.2d 779 (Ariz. Ct. App. 1999); *State v. Bollig*, 593 N.W.2d 67 (Wis. Ct. App. 1999); *People v. Moore*, 81 Cal. Rptr. 2d 658, 660 (Cal. Ct. App. 1998)).[1]

¶ 42                          2. *Sixth Amendment Principles*

¶ 43    We next consider defendant's argument that his plea was not knowing or voluntary because his counsel failed to advise him that the offense to which he was pleading guilty could potentially subject him to involuntary commitment if the State elected to file a petition under the Act. Defendant relies on *Padilla v. Kentucky*, 559 U.S. ___, 130 S. Ct. 1473 (2010), which decision was rendered during the pendency of his appeal. There, the United States Supreme Court considered a defense counsel's obligations to his client during the plea process. The Court held that under the sixth amendment right to effective assistance of counsel, defense counsel "must inform [a] client whether his plea carries a risk of deportation." *Id.* at ___, 130 S. Ct. at 1486.

¶ 44    As the Supreme Court recently reiterated, the sixth amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of the criminal proceedings, which include the entry of a guilty plea. *Missouri v. Frye*, 566 U.S. ___, ___, ___, 132 S. Ct. 1399, 1405, 1407-08 (2012). To establish a claim of ineffective assistance of counsel in the plea process, the defendant must show counsel's performance was deficient and that the deficient performance resulted in prejudice. *Hill*, 474 U.S. at 57; *Strickland v. Washington*,

---

[1]In at least two jurisdictions, the trial court does have an obligation to advise of the possibility of civil commitment. See *State v. Bellamy*, 835 A.2d 1231, 1238 (N.J. 2003) ("[W]hen the consequence of a plea may be so severe that a defendant may be confined for the remainder of his or her life, fundamental fairness demands that the trial court inform defendant of that possible consequence.")); Mass. R. Crim. P. 12(c)(3)(B) (the court must "inform the defendant on the record *** of any different or additional punishment based upon subsequent offense or sexually dangerous persons provisions of the General Laws, if applicable").

466 U.S. 668, 687 (1984). More specifically, a defendant must prove that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 45    Prior to *Padilla*, most state and federal courts, including Illinois, had generally held that the failure to advise a client of potential collateral consequences of a conviction fell outside the requirements of the sixth amendment. *Padilla*, 559 U.S. at ___ & n.9, 130 S. Ct. at 1481 & n.9; *People v. Huante*, 143 Ill. 2d 61, 71 (1991); Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L. Rev. 697, 699 (2002). Although not extensively litigated, courts specifically addressing this particular consequence of civil commitment found no duty to advise, relying on the direct/collateral consequence paradigm. See, *e.g.*, *Page v. State*, 615 S.E.2d 740, 742 (S.C. 2005)*; Morales v. State*, 104 S.W.3d 432, 437 (Mo. Ct. App. 2003); *Bussell v. State*, 963 P.2d 1250, 1254 (Kan. Ct. App. 1998).

¶ 46    Nevertheless, the Supreme Court has recently emphasized the growing number of cases that are resolved by the plea process and defense counsel's related and important duties and responsibilities in that process. *Frye*, 566 U.S. at ___, 132 S. Ct. at 1407. In *Frye*, the Court explained that the reality is that 94% of state convictions are now resolved with a guilty plea and that "plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Id.* at ___, 132 S. Ct. at 1407. As the Court stated, in today's criminal proceedings, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Id.* at ___, 132 S. Ct. at 1407.

¶ 47    We are also cognizant that in recent years several scholars and commentators have brought to light potential problems inherent in a rigid categorical system of distinguishing between direct and collateral consequences, especially in the sixth amendment context, given this new landscape and the framework for analyzing claims of ineffective assistance. See McGregor Smyth, *From "Collateral" to "Integral": The Seismic Evolution of Padilla v. Kentucky and Its Impact on Penalties Beyond Deportation*, 54 How. L.J. 795 (2011); Gabriel J. Chin & Margaret Love, *Status as Punishment: A Critical Guide to Padilla v. Kentucky*, 25 Crim. Just. 21, 27-28 (2010); Jenny Roberts, *Ignorance Is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process*, 95 Iowa L. Rev. 119, 124-25 (2009); Jenny Roberts, *The Mythical Divide Between Collateral and Direct Consequences of Criminal Convictions: Involuntary Commitment of "Sexually Violent Predators"*, 93 Minn. L. Rev. 670, 673-77 (2008); 87 Cornell L. Rev. at 701-02, 712-13.

¶ 48    In particular, they have explained that the imposition and significance of collateral consequences has grown tremendously in recent years. 93 Minn. L. Rev. at 701-02; ABA Standards for Criminal Justice Standard 14-3.2(f), Commentary, at 126 (3d ed. 1999) ("An increasing burden must fall to defense counsel by virtue of the growing number and range of consequences of conviction."). They suggest that the growth of collateral consequences has changed the landscape of what duties are owed by counsel in the plea process. 93 Minn.

L. Rev. at 701-02. They have also noted the distinction between the role of the court and that of counsel in the plea process, suggesting that counsel's role encompasses a broader range of considerations. Margaret Colgate Love, *Collateral Consequences After Padilla v. Kentucky: From Punishment to Regulation*, 31 St. Louis U. Pub. L. Rev. 87, 100 (2011) ("The considerations that make the direct/collateral distinction sensible from the standpoint of institutional competence when applied to a court, do not apply to criminal defense lawyers' relationships with their clients."); 95 Iowa L. Rev. at 149 (noting cases that have explained that defense counsel may be in a better position to understand a particular defendant's circumstances); 87 Cornell L. Rev. at 730 ("There is good reason to doubt that the duties and conduct of courts and defense lawyers should be regarded as identical in this context.").

¶ 49 In *Padilla*, the Supreme Court explained that it had never applied the collateral consequences rule "to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*." *Padilla*, 559 U.S. at ___, 130 S. Ct. at 1481. However, the Court did not need to consider whether the distinction remains appropriate in the context of sixth amendment rights because of the unique nature of deportation. *Id.* at ___, 130 S. Ct. at 1481. Specifically, the Court found that even though deportation is a civil consequence of a guilty plea, it should not be categorically eliminated from defense counsel's duties because it is a "particularly severe 'penalty,' " "intimately related to the criminal process," and "nearly an automatic result" due to recent changes in immigration law, which have "enmeshed" the conviction with the penalty of deportation. *Id.* As such, because of its close connection to the criminal process, deportation was "uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at ___, 130 S. Ct. at 1482. Therefore, the Court held that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," and that *Strickland* applied to Padilla's claim. *Id.* at ___, 130 S. Ct. at 1482. Accordingly, *Padilla* commands that where consequences are severe, certain to occur, "enmeshed" in the criminal process, and are of predictable importance to a defendant's calculus, they are not categorically excluded from *Strickland*'s purview despite being traditionally categorized as collateral.

¶ 50 As we stated previously, we recognize that the possibility of involuntary commitment here is not immediate, automatic, or mandatory in the same way that deportation would be. The conviction of a sexually violent offense does not serve as the sole predicate for imposing the commitment under the Sexually Violent Persons Commitment Act and requires a separate civil proceeding, where a defendant will have an opportunity to contest its application to him. However, under the Act, it is certain that a person convicted of a sexually violent offense is eligible for commitment and the conviction alone will definitely subject the defendant to a mandatory comprehensive evaluation for commitment nearing the end of his prison term. See 725 ILCS 207/9 (West 2008) (a person convicted of a sexually violent offense "*will be considered* for commitment under this Act prior to [their] release date" (emphasis added)). In that sense, the consequence is "enmeshed" in the criminal process. Additionally, if a petition is filed as a result of the mandatory evaluation, the filing of the petition tolls the running of a defendant's term of mandatory supervised release (725 ILCS 207/15(e) (West 2006)), also demonstrating that the consequence is "enmeshed" or

integrated with the criminal sentence.

¶ 51    More importantly, much like the serious consequence of deportation, the potential consequence of involuntary commitment is no doubt uniquely severe. The Supreme Court has acknowledged that the practical effect of a sexually violent person commitment "may be to impose confinement for life." *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997) (Kennedy, J., concurring) (examining a similar statute); see also *Bellamy*, 835 A.2d at 1238 (finding under similar statute that commitment is "theoretically without end" and "[i]t matters little if the consequences are called indirect or collateral when in fact their impact is devastating" (internal quotation marks omitted)).

¶ 52    As the facts of this case reveal, the consequence of involuntary commitment, if imposed, may be more severe than the criminal penalty imposed by the court, overshadowing the penalty. Because of its severity, we cannot deny that the possibility of commitment under the Sexually Violent Persons Commitment Act may be materially important to a defendant's calculus in determining whether to plead guilty.

¶ 53    Accordingly, where a serious liberty interest is potentially at stake, where it is certain that those convicted of sexually violent offenses will definitely be considered for commitment prior to release from imprisonment, and where the proceedings, if instituted, will impact a defendant's term of mandatory supervised release, we find this particular consequence, like deportation, should not be categorically excluded from a cognizable claim of ineffective assistance of counsel and a defendant's sixth amendment rights.

¶ 54    Rather, as noted by the Court in *Padilla*, whether counsel's representation was deficient is a question of reasonableness and "necessarily linked to the practice and expectations of the legal community." *Padilla*, 559 U.S. at ___, 130 S. Ct. at 1482. There, the Court found that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* The Court found the American Bar Association standards and those like it "may be valuable measures of the prevailing professional norms of effective representation." *Id.* at ___, 130 S. Ct. at 1482; see also *Frye*, 566 U.S. at ___, 132 S. Ct. at 1408 ("Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides.").

¶ 55    Here, defendant relies on the ABA Standards considered in *Padilla*, and argues that the duty to advise in this context was generally acknowledged as a prevailing professional norm at the time of defendant's plea in 2006. At the time of the plea, the ABA Standards provided as follows:

> "To the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea." ABA Standards for Criminal Justice Standard 14-3.2(f) (3d ed. 1999).

¶ 56    The comments to Standard 14-3.2(f) provide additional guidance, particularly in the area of sexual offenses. The comment acknowledges that it would be very difficult for defense counsel to "fully brief every client on every likely effect of a plea in all circumstances" and that such an "expansive debriefing" is not required by courts to validate a guilty plea. *Id.* at

-14-

126.

¶ 57 Nevertheless, it goes on to state that "counsel should interview the client to determine what collateral consequences are likely to be important to a client given the client's particular personal circumstances and the charges the client faces." *Id.* at 127. More specifically, it states:

> "Knowing the likely consequences of certain types of offense conduct will also be important. Defense counsel should routinely be aware of the collateral consequences that obtain in their jurisdiction with respect to certain categories of conduct. The most obvious such categories are controlled substance crimes and sex offenses because convictions for such offense conduct are, under existing statutory schemes, the most likely to carry with them serious and wide-ranging collateral consequences." *Id.*

See also National Legal Aid and Defender Association, Performance Guidelines for Criminal Representation, Guideline 6.2 (1995) ("counsel should be fully aware of, and make sure the client is fully aware of: *** (3) other consequences of conviction such as deportation, and civil disabilities").

¶ 58 Standards of attorney competency in this area have evolved and continue to evolve as the bar becomes more aware of and recognizes the need for more thorough warnings where the consequences, albeit collateral, are severe, certain, and enmeshed in the criminal process. We note the addition of new databases that will ease the burden on defense counsel in this task, including the ABA National Inventory of the Collateral Consequences of Conviction, which publishes an online database where consequences "can be searched and sorted within and across jurisdictions, by keyword, consequence type, triggering offense category, and other salient characteristics." http://www.abacollateralconsequences.org/CollateralConsequences/docs/ProjectDescription.gp.ml.pdf.

¶ 59 As the ABA Standards and the like recognize, not every failure of counsel to inform the defendant of applicable collateral consequences is a basis for withdrawing a plea of guilty. Requiring defense counsel to predict and explain all of the ways in which a client will be impacted by a conviction would not be reasonable. Rather, where the consequence is severe, certain, and sufficiently enmeshed in the criminal process the sixth amendment right to counsel may give rise to a basis for withdrawing a plea.

¶ 60 A reasonable attorney would advise his client under these circumstance where the consequence is serious, where it is certain that because of the nature of the offense his client will be evaluated for possible life-long commitment, and where the proceedings will impact his mandatory supervised release term if a petition under the Act is filed. Consequently, we hold that defense counsel has a minimal duty to advise a defendant who pleads guilty to a triggering offense subject to the provision of the Sexually Violent Persons Commitment Act that he will be evaluated for and may risk involuntary commitment after completing his prison term. We note that unlike the complexity of immigration law, the task is not onerous or complicated, as the Act is straightforward in this regard and is limited to a defined group of enumerated sexually violent offenses. 725 ILCS 207/5 (West 2006) (listing the enumerated offenses).

¶ 61 With that said, we also recognize that to establish deficient representation a court must

"judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). When viewing the facts as presented in this record, we find that defense counsel was intimately familiar with the Act and the potential consequences for sexually violent offenders, having been in charge of the sexually violent persons division of the Attorney General's office. We are also aware that defense counsel testified that he had received a report from his expert that defendant was not a sexually dangerous person, that he did not anticipate a sexually violent person petition being filed, and that he did not advise defendant of that possibility.

¶ 62     However, ultimately, as the appellate court found, at the hearing on his motion to withdraw his plea, defendant was less than clear as to whether he had discussed the possibility of a sexually violent person petition with counsel and the extent of that conversation and his knowledge prior to the plea. It is defendant's burden to establish that his plea was not knowing due to counsel's deficiency. *People v. Manning*, 227 Ill. 2d 403, 412 (2008). Accordingly, given that defendant answered "[y]es" when asked whether he had a conversation about a sexually violent person petition, we cannot say that he has met his high burden to establish that his counsel was deficient in this case.

¶ 63     We further note that even if we were to find deficient representation in this case, defendant also must prove that he was prejudiced. See *Padilla*, 559 U.S. at ___, 130 S. Ct. at 1485 (emphasizing that "[s]urmounting *Strickland*'s high bar is never an easy task"). Defendant must establish a reasonable probability that, but for his attorney's errors, " 'the result of the proceeding would have been different.' " *Lafler v. Cooper*, 566 U.S. ___, ___, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 694). To obtain relief on this type of claim in the plea context, defendant must show " 'that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.' " *Id.* at ___, 132 S. Ct. at 1384-85 (quoting *Hill*, 474 U.S. at 59); *People v. Hall*, 217 Ill. 2d 324, 335 (2005).

¶ 64     We have previously explained that "[a] bare allegation that the defendant would have pleaded not guilty and insisted on a trial if counsel had not been deficient is not enough to establish prejudice. *Id.* Rather, we have found that a defendant must assert either a claim of actual innocence or articulate a plausible defense that could have been raised at trial. *Id.* at 335-36. Relying on *Hall*, we have noted that the question will depend largely on predicting whether the defendant would have likely been successful at trial. *Id.* at 336.

¶ 65     The Court noted in *Padilla* that "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at ___, 130 S. Ct. at 1485. Although we recognize that there may be circumstances where a defendant could prove that the deficient performance affected the outcome of the plea process in other ways, as with all applications of the second prong of the *Strickland* test, the question whether a given defendant has made the requisite prejudice showing will turn on the facts of a particular case. *Strickland*, 466 U.S. at 695-96.

¶ 66     In this case, defendant has not articulated any prejudice beyond stating that had he known of the possibility for civil commitment he would not have pled guilty because he thought that

it would resolve the matter. Without more than this mere assertion, defendant has not met his burden to establish the necessary showing under *Strickland* to merit a withdrawal of his plea in this case.

¶ 67                    3. *Breach of the Plea Agreement*

¶ 68    Defendant additionally maintains that the State's decision to file a sexually violent person petition constituted a breach of the plea agreement. A plea bargain has often been compared to an enforceable contract. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971); *People v. Whitfield*, 217 Ill. 2d 177, 189 (2005) ("[I]f a defendant shows that his plea of guilty was entered in reliance on a plea agreement, he may have a due process right to enforce the terms of the agreement.").

¶ 69    Here, defendant received the benefit of his bargain. The agreement as reflected by the record was that defendant agreed to plead guilty to count VI in exchange for a dismissal of the remaining charges, withdrawal of the sexually dangerous person petition, and a recommended sentence of 14 years in prison with an understanding that defendant was entitled to good-time credit for time spent in custody. The record fails to reflect that the State expressly promised not to pursue a sexually violent person petition under the Act. Nor is that a promise that would have guaranteed that a petition would not be filed given that the Attorney General could file such a petition in the first instance. 725 ILCS 207/15(a)(1) (West 2006). The issue of a sexually violent person petition was never discussed during negotiations with the prosecutor. Accordingly, for all of the foregoing reasons, the trial court did not err in denying defendant's motion to withdraw his plea.

¶ 70                          III. CONCLUSION

¶ 71    In sum, we hold that the trial court had jurisdiction to entertain the plea of guilty to the nol-prossed charge and that defendant received the benefit of his bargain with the State. We additionally hold that defense counsel owes a duty to inform a defendant who pleads guilty to a sexually violent offense that he will be considered for involuntary commitment at the end of his prison term. Nevertheless, defendant failed to meet his burden to establish that in this case his counsel was deficient or that he was prejudiced by any alleged deficiency. Accordingly, for all of the foregoing reasons, the trial court did not err in denying defendant's motion to withdraw his plea. Consequently, we affirm the judgment of the appellate court.

¶ 72    Affirmed.

¶ 73    JUSTICE FREEMAN, dissenting:

¶ 74    Today's decision upholds a conviction upon a plea for which no criminal charge was actually before the trial court. Illinois law precludes this court from sustaining the conviction

under these circumstances; therefore, I dissent.

¶ 75 A grand jury indicted defendant in August 1999 on five counts of predatory criminal sexual assault and five counts of aggravated criminal sexual abuse, including count VI, which is the charge upon which defendant's conviction is based. After defendant successfully sought the suppression of certain statements he made to the police, the State decided to nol-pros counts I, II, III, IV[2] and VI and informed both defendant and the trial judge of that decision in open court. To that end, the court entered the following order on December 28, 1999:

> "On motion of the State's Attorney, Attorney for the People of the State of Illinois; leave given the State's Attorney to Nolle Prosse the above entitled cause;
>
> Cts 1, 2, 3, 4 & 6 Only Nolle Prossed, defendant *discharged*;
>
> Surety on the bond released." (Emphasis added.)

With respect to the remainder of the indictment's charges, *i.e.*, counts V, VII, VIII, IX and X, the State chose to use them as the basis for a civil commitment proceeding against defendant under the Sexually Dangerous Persons Act.

¶ 76 Defendant objected to the State's use of the *nolle prosequi*, arguing that the State was attempting to improve its "odds" after the court had made certain pretrial rulings that were favorable to defendant. The assistant State's Attorney denied the allegations and asserted that the State was not required to give an explanation for its decision to enter into the *nolle prosequi*. She specifically noted that the five "nollied" charges were "nonentities at this point" and that no action could be taken against defendant with respect to them "unless those nolle charges are brought back." While the court noted defendant's objection to the State's request for the *nolle prosequi*, the court stated that there was no issue before it with respect to the State's action until the point in time where the State attempted to refile the charges as required, which, the court noted, the State had not sought to do. The order of *nolle prosequi* therefore stood.

¶ 77 Over the next several months, the parties took part in the civil commitment proceeding, and a jury later adjudicated defendant a sexually dangerous person. While the civil commitment proceedings were ongoing, the five remaining criminal charges from the August 1999 indictment (counts V, VII, VIII, IX and X) continued to pend against defendant. According to the State, these charges would only be dismissed once defendant had been discharged from his civil commitment. Based upon this representation, the circuit court, in January 2001, ordered the case to be classified as an "administrative dismissal" in light of defendant's continued confinement pursuant to the Sexually Dangerous Persons Act.

¶ 78 However, in 2003, the appellate court reversed the jury's verdict in the civil commitment

_____

[2]There is some confusion in the record with respect to count IV in that the indictment does not contain a count that is actually labeled as "Count 4." Rather, there are two counts that are labelled as "Count 3," the first of which charges defendant with committing predatory criminal sexual assault of a child on A.B. by placing his finger in her vagina, and the second of which charges that defendant committed predatory criminal sexual assault of a child by placing his penis in A.B.'s vagina.

case and remanded the matter for a new trial on the question of whether defendant was a sexually dangerous person as defined under the Sexually Dangerous Persons Act. Three years later, the State informed the court that it had chosen not to pursue another civil commitment under the Sexually Dangerous Persons Act. Rather, it had entered into plea negotiations with defendant with respect to the criminal charges that remained pending during the period of defendant's civil confinement. The State acknowledged the January 2001 administrative order and indicated that it was "vacating that administrative order with whatever effect it had, so the indictment is back before the Court. The Defendant would be pleading guilty to Count Six of the indictment, which is one charge of aggravated criminal sexual abuse."

¶ 79    The foregoing facts reveal that after the circuit court's entry of the December 1999 *nolle prosequi* order, only counts V, VII, VIII, IX and X remained pending against defendant from the original August 1999 indictment while he was confined pursuant to the civil commitment. None of the other five charges from the 1999 indictment, most importantly count VI, were before the court when it entered judgment on defendant's plea in September 2006. Indeed, count VI was as much a "nonentity" in September 2006 as it was nearly seven years earlier in December 1999 when the assistant State's Attorney characterized it as such on the record in open court. Stated simply, count VI of the indictment no longer existed by virtue of the State's *nolle prosequi*.

¶ 80    This court has long recognized that the State, as the prosecuting agent, has the discretion not only to decide what charges to bring, but also to decide whether charges should be dismissed. See *People v. Rhodes*, 38 Ill. 2d 389, 396 (1967). The effect of a *nolle prosequi* is "to terminate the charge to which it is entered and to permit the defendant to go wherever he pleases, without entering into a recognizance to appear at any other time. If it is entered before jeopardy has attached, it does not operate as an acquittal, so as to prevent a subsequent prosecution for the same offense." *People v. Watson*, 394 Ill. 177, 179 (1946). In order to reinstate the prosecution, the State is required to either seek the *vacatur* of the original *nolle prosequi* order (within 30 days)[3] or simply file a new charging instrument. *People v. Woolsey*, 139 Ill. 2d 157 (1990).[4] Neither was done here.

¶ 81    Defendant rightly contends that without the State having first refiled a new charge as to count VI or without *vacatur* of the order of its *nolle prosequi*, the circuit court could not

---

[3]It should be noted that while the court states that a motion to vacate is one proper vehicle to use in order to reinstate, the court does not acknowledge that the circuit court must have jurisdiction over the matter in order to so vacate. Generally, that means the motion to vacate must be made within 30 days of the entry of the *nolle prosequi* order.

[4]Illinois law also permits criminal charges to be stricken by the State with leave to reinstate (SOL), a procedure that should not be confused with the *nolle prosequi* procedure. Under the SOL procedure, a defendant is still charged with the crime, and speedy-trial provisions continue to run. In contrast, a *nolle prosequi* terminates the charge, and the speedy-trial provisions stop running unless there is evidence that the State sought to evade the speedy-trial guarantee through the use of the *nolle prosequi*. Because the charges are terminated under this procedure, reinstatement is required in order for the State to subsequently proceed on the charge.

accept his guilty plea because the charge did not exist. The court today disagrees, holding that "[a] formal accusation is not a prerequisite to jurisdiction but, rather is a constitutional requirement that stems from the fundamental right of due process." *Supra* ¶ 28. The court acknowledges that the Illinois Constitution requires such process, but that it represents only a fundamental, personal right that does not affect the power of the court to adjudicate a controversy. According to the court, "the failure to refile" count VI "did not affect the power of the circuit court to hear and render a judgment on the plea." *Supra* ¶ 29. As such, the court holds that defendant's conviction is merely voidable, not void.

¶ 82    This holding finds no support in Illinois law. In Illinois, jurisdiction is conferred by the Constitution. Pursuant to article VI, section 9, of our constitution, the circuit court has jurisdiction over all "justiciable matters." This means that there must be a justiciable matter in existence before subject matter jurisdiction attaches. In Illinois, it is the State's Attorney, as representative of the People of the State of Illinois, who is empowered to commence and prosecute criminal cases in which the People of the State may be concerned. *People v. Pankey*, 94 Ill. 2d 12, 16 (1983). The decision whether to initiate any criminal prosecution at all as well as to choose which of several charges shall be brought are the functions within the exclusive discretion of the State's Attorney. *Id.* As such, a justiciable matter is created when the State levels charges against a criminal defendant and files them in the circuit court.

¶ 83    In this case, 10 "justiciable matters" were created when the State brought the 10 separate criminal charges contained in its August 1999 indictment against defendant and filed them with the court. After the entry of the State's *nolle prosequi*, however, only five "justiciable matters" remained over which the circuit court had subject matter jurisdiction. Those five justiciable matters were the charges contained in counts V, VII, VIII, IX and X, which continued to pend against defendant while he was committed under the Sexually Dangerous Persons Act. Count VI, at issue here, was *not* one of those justiciable matters as it no longer existed. Count VI thus was no longer a "justiciable matter" as that term is used in our Constitution. The State terminated the charge against defendant in count VI in December 1999. It never sought to reinstate that charge nor did it seek to vacate the *nolle prosequi* order pertaining to it, as it was required under our case law to do. If something is required, it is not optional.

¶ 84    A judgment is void, and hence subject to attack at any time, only when a court either exceeds its jurisdiction or has simply not acquired jurisdiction. *People. Davis*, 156 Ill. 2d 149, 155 (1993). Once the State obtained its *nolle prosequi* order in December 1999, the charges contained in count VI, as well as those contained in counts I, II, III and IV no longer were justiciable matters over which the circuit court had subject matter jurisdiction, much less the authority to accept defendant's plea. All the State had to do to make the charge justiciable was to either reinstate the charge (either by reindictment by the grand jury or the filing of an information) or seek to vacate the *nolle prosequi* order pertaining to it, as it was required under our case law to do.

¶ 85    Defendant now stands convicted of the aggravated criminal sexual abuse of M.A. relating to events occurring from December 1998 through July 1999. However, at the time of the entry of the plea upon which the conviction was based, there was no valid charge pending against defendant as to this crime. The only charges that remained pending against him were

count V (aggravated criminal sexual abuse of K.S. relating to events occurring in 1995), count VII (aggravated criminal sexual abuse of J.S. relating to events occurring in 1995), count VIII (aggravated criminal sexual abuse of J.S. relating to events occurring in 1995), count IX (aggravated criminal sexual abuse of J.S. relating to events occurring in 1995) and count X (aggravated criminal sexual assault of A.S. relating to events occurring in 1997). As such, there was no "justiciable matter" for the circuit court to adjudicate with respect to count VI. While I do not disagree that the circuit court here had the "power" to hear this "controversy" in the general sense that Illinois courts adjudicate criminal proceedings under the Criminal Code, the circuit court did not have before it any charge brought by the State alleging the aggravated criminal sexual abuse of M.A. on which to enter judgment, much less a 14-year sentence. This court has held that the circuit court has no authority to accept a plea of guilty and enter judgment where there is no criminal charge before the court. *People v. Pankey*, 94 Ill. 2d 12, 17 (1983).

¶ 86 The State's right to try defendant under count VI of the August 1999 indictment came to an end when it asked the court to enter a *nolle prosequi* on the charge in December 1999. Because jeopardy had not yet attached, the State retained its ability to retry the defendant on that charge—all it had to do was to refile the charge. For some reason, whether it be mere oversight, carelessness, or even expediency, the State failed to do so. The court today rewards the State's failure to follow proper procedure by negating the requirement that the State must recharge a defendant before proceeding on a charge nol-prossed. In the wake of this opinion, why would the State ever reindict charges previously the subject of *nolle prosequi* if its failure to do so no longer prevents a court from rendering a judgment of conviction on those same unrefiled charges? The court has, in essence, given the State the right to, on the one hand, invoke its discretion to nol-pros a defendant upon indictment and then try him nevertheless. Until today, no such right existed in Illinois.

¶ 87 More troubling than this, however, is the fact that today's opinion gives our circuit courts the power to enter judgment and impose a prison sentence on a criminal charge that does not exist. This is an extraordinary result. Apparently, all that suffices is that there was an indictment at some point in time that charged a defendant with various crimes. Even if some of those charges are terminated and no longer exist, the indictment itself is enough to give the circuit court the authority to accept a plea for the no longer pending, nonexistent, uncharged crime. I know of no concept of subject matter jurisdiction that would allow for such a result. That this result obtains in a case which also contains serious allegations of ineffective assistance of counsel during the plea proceedings should give even more pause. It is bad enough that neither the trial judge nor the prosecutor here paid any attention to what charges remained pending from six years earlier. Worse still was that neither did defendant's own attorney. Defense counsel's inattention to this aspect of defendant's case should not come as that much of a surprise; counsel has admitted frankly that he failed to advise defendant of the serious consequences (possible life-long commitment) of accepting this plea. Rather than send a strong message that such lax practices on the part of the trial court, the government attorney and defense counsel will not be tolerated, today's opinion condones them, all but ensuring that such practice will continue to occur in our courtrooms.

¶ 88 In light of the above, I would follow prior precedent and hold that the prosecution on

count VI ended when the circuit court, upon motion of the State, entered the *nolle prosequi* on December 28, 1999. Accordingly, the circuit court had no valid charge upon which to enter judgment on count VI on September 26, 2006. Defendant's plea of guilty should therefore be vacated.

¶ 89      JUSTICE BURKE joins in this dissent.