2023 IL App (1st) 221358

FIFTH DIVISION
December 29, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-1358

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 13778 |
| | ) | |
| ANGELO SHAW, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Angelo Shaw appeals from the second-stage dismissal of his postconviction petition alleging due process and sixth amendment right to counsel violations in connection with his guilty plea. See U.S. Const., amend. VI. In exchange for a recommended sentence of five years in prison, Mr. Shaw pleaded guilty in 2013 to one count of criminal sexual assault. By statute, his sentence included a term of mandatory supervised release (MSR) of three years to natural life. 730 ILCS 5/5-8-1(d)(4) (West 2012). Mr. Shaw alleged in his petition that he served his five-year sentence but was unable to secure a host site meeting the many conditions of release imposed on him as a convicted sex offender. He was accordingly "violated at the door" for failing to comply with the terms of his release and returned to custody. Mr. Shaw ultimately served over 4 ½ additional years in prison as a result of that practice.

¶ 2    Mr. Shaw alleged in his petition that he had a viable defense of consent and would not have pleaded guilty if he had known that this could happen. Mr. Shaw argues on appeal that he made a substantial showing in his petition that both the circuit court judge and his counsel failed to inform him of this serious consequence of his guilty plea and that this violated his rights to due process and effective assistance of counsel. For the reasons below, we agree that Mr. Shaw made a substantial showing of these constitutional violations. We reverse the circuit court's dismissal of his petition and remand for a third-stage hearing on both of his claims.

¶ 3                                    I. BACKGROUND

¶ 4                             A. Mr. Shaw's Guilty Plea

¶ 5    Mr. Shaw was charged by indictment with five counts each of criminal sexual assault and aggravated criminal sexual assault. On April 29, 2013, he pleaded guilty to a single count of criminal sexual assault. As a factual basis for the plea, the parties stipulated that the State's evidence at trial would establish the following. On June 12, 2010, the victim, A.G., spoke with Mr. Shaw by telephone and text message before meeting with him and ultimately agreeing to go with him to his house. While there, Mr. Shaw forced A.G. to have nonconsensual vaginal intercourse. Mr. Shaw falsely claimed that he was a police officer and told A.G. that she would be "in trouble" if she told anyone about the encounter. The following day, A.G. called the police and told them what happened. She also told several friends and family members about the sexual assault. A sexual assault kit was administered, and semen from the vaginal swabs matched Mr. Shaw's DNA profile.

¶ 6    At the plea hearing, the circuit court admonished Mr. Shaw that he would be pleading guilty to a Class 1 felony punishable by 4 to 15 years in prison, to be served at 85%, and/or a fine of up to $25,000. The court explained that Mr. Shaw would serve two years of MSR following his

prison term and that he would have to register as a sex offender for life. Mr. Shaw said that he understood all of this and still wanted to plead guilty. He stated that no one was forcing, threatening, or telling him to plead guilty but that he was doing so of his own free will. The court advised Mr. Shaw that if he was not a citizen of the United States, his plea could result in deportation, and Mr. Shaw said he understood that too.

¶ 7 The circuit court concluded that there was a sufficient factual basis for the plea, that Mr. Shaw understood the nature and consequences of the plea, and that the plea was knowingly and intelligently made. The court agreed with the parties that a sentence of five years in prison, to be served at 85% and with a credit of 1024 days for time served, followed by two years of MSR, was appropriate. The court asked Mr. Shaw if he had any questions about his sentence before informing him of his right to appeal and the requirement that he first move to withdraw his plea.

¶ 8 Mr. Shaw's case was passed and then recalled a short while later, when it was discovered that the circuit court had imposed the wrong term of MSR. The court explained the mistake, telling Mr. Shaw that he would serve an MSR term not of two years but of three years to life, with his eventual release from MSR to be determined by the Prisoner Review Board (PRB). Mr. Shaw indicated that he had already discussed this with his counsel. The following exchange then took place:

> "THE COURT: So based on the count you [pled] guilty to, it is mandatory supervised release determined not by me but by the parole board of three years to life. Okay. Do you understand that?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Does that change your plea in any way, shape or form?
>
> THE DEFENDANT: Is that determined through good behavior or is that—I

3

mean—

THE COURT: You would have to go in front of the parole board. It is determined by them. And it would be a minimum of three years but it could be all the way up to for the rest of your life.

THE DEFENDANT: So is that saying that my—that change my out date?

MS. STEINER [(THE ASSISTANT PUBLIC DEFENDER)]: He is just wondering if it changes his time served in custody.

THE COURT: No. It does not. But it will change your reporting after you get out. It will change that. It changes your parole period. Before I told you it was two years mandatory supervised release. Now it is three years to life. Okay. What I need to know, are you agreeable to that?

THE DEFENDANT: Yes, I am.

THE COURT: All right. Does that make you want to change your plea? Does that change anything in your mind that would make you want to withdraw your plea, or do you want to stay with your plea? Because it does not change your out date. But that part, your mandatory supervised release, is changing.

THE DEFENDANT: Okay. So I don't have to go to the parole board in order to get out, do I?

THE COURT: I am not sure of the process. And I am not going to advise you as to the process because I don't know exactly what it is. But it is not determined by me. That's all I can tell you. It is three years to life.

THE DEFENDANT: I am baffled as to do I have to go to the parole board and ask to get out? Like I don't know if that change my out date.

THE COURT: It won't change your out date. It will change your reporting requirements after you get out.

THE DEFENDANT: Oh, okay. All right. I understand.

THE COURT: You understand?

THE DEFENDANT: Yes, I do.

THE COURT: You want to remain firm in your plea?

THE DEFENDANT: Yes, I do.

THE COURT: The record will reflect that, first of all, Ms. Steiner went and explained this to him. Is that correct?

MS. STEINER: Yes, Judge.

THE COURT: I have explained it to him as well. And he does not wish to change his plea or withdraw his plea based on my previous erroneous instructions of telling him it was two years. And that does not change his plea. It is three years to life. And he is fully apprised. And do you understand it completely? Any other questions?

THE DEFENDANT: No."

¶ 9     Mr. Shaw's sentence was accordingly modified to include an MSR term of three years to life.

¶ 10         B. Mandatory Supervised Release and "Turnaround Practice" in Illinois

¶ 11    Mr. Shaw's postconviction claims rest on the process in Illinois by which individuals who have completed their terms of incarceration are released from prison to serve their terms of MSR. The Unified Code of Corrections (Code) provides that a term of MSR must follow every sentence of imprisonment and specifies the length of that term in section 5-8-1(d) of the Code (730 ILCS 5/5-8-1(d) (West 2012)). For individuals convicted of certain sex offenses, including criminal

sexual assault, the term of MSR is "a minimum of 3 years" and "a maximum of the natural life of the defendant." *Id.* § 5-8-1(d)(4). Section 3-14-2.5 of the Code, governing the "[e]xtended supervision of sex offenders," also makes clear that a term of MSR imposed in connection with one of these offenses does not begin to run until the defendant has been released from prison. *Id.* § 3-14-2.5(e) (providing that "the term of extended mandatory supervised release pursuant to paragraph (4) of subsection (d) of Section 5-8-1 of this Code *shall toll during any period of incarceration*" (emphasis added)). There is no similar provision for any of the other offenses listed in section 5-8-1(d).

¶ 12 Conditions of release while on MSR are determined by the PRB, and compliance with those conditions is monitored by the Illinois Department of Corrections (IDOC). *Id.* §§ 3-3-1(a)(5), 3-3-7(a), 3-14-2(a). Some statutory conditions of release—like refraining from possessing a firearm or other dangerous weapon, refraining from violating any criminal statute, and regularly reporting to an agent of the IDOC—apply to everyone on MSR. *Id.* § 3-3-7(a). Individuals, like Mr. Shaw, who are required to register as sex offenders, are subject to a variety of other statutorily mandated conditions. The Code provides, for example, that they may not reside with other convicted sex offenders and must refrain from accessing social networking websites *Id.* § 3-3-7(a)(7.6), (7.12). If convicted of offenses, like criminal sexual assault, that qualify them as sexual predators, they must also wear an approved electronic monitoring device while on MSR. *Id.* § 3-3-7(a)(7.7).

¶ 13 The statutory scheme gives the PRB and IDOC significant discretion to impose and enforce additional conditions of release on convicted sex offenders. The PRB, for example, may prohibit a sex offender from using a computer or other device with Internet capability without the IDOC's prior written approval. *Id.* § 3-3-7(b)(7.6)(i). It may also require sex offenders to reside only at

IDOC-approved locations, forbid them from residing near parks, schools, day cares, swimming pools, beaches, theaters, "or any other places where minor children congregate," and require them to "comply with all other special conditions that the [IDOC] may impose that restrict [them] from high-risk situations and limit [their] access to potential victims." *Id.* § 3-3-7(b-1)(1), (12), (15).

¶ 14    Inmates serving time for sex offenses in Illinois may be "violated at the door" if, upon the completion of their prison terms, they are unable to secure host sites that comply with their terms of release. The United States District Court for the Northern District of Illinois explained this practice in *Murdock v. Walker*, No. 08 C 1142, 2014 WL 916992, at *2 (N.D. Ill. Mar. 10, 2014). It noted that as a prisoner's projected release date approaches, he or she must submit a release plan to the PRB. *Id.* The PRB then determines whether the prisoner is eligible for release and on what conditions, issuing a release order with a specific release date for the prisoner. *Id.*; 730 ILCS 5/3-3-1(a)(5), 3-3-7(a) (West 2012). The IDOC then investigates the terms of the prisoner's release plan and determines if they will comply with the prisoner's conditions of release. *Murdock*, 2014 WL 916992, at *2. Inmates without an approved host site are not released from prison. *Id.* at *3. Instead, in what has become known as " 'turnaround practice,' " they are "violated at the door" and returned to the general prison population. *Id.* Such inmates are given new release dates but, because they are often unable to rectify their lack of suitable housing, are subject to—in the *Murdock* court's words—a "Kafkaesque loop" ending only when the inmate "either [finds] a suitable housing location or serve[s] out the remainder of his parole time in prison." *Id.* at *4.

¶ 15    Challenges to these practices have met with some success in recent years. In 2019, for example, the Northern District of Illinois concluded that the way the IDOC was enforcing its host-site policies "create[d] an illegal classification based on wealth" that, in violation of their right to equal protection, "indefinitely deprive[d] [indigent sex offenders] of their liberty" as a result of

their inability to afford qualifying housing. *Murphy v. Raoul*, 380 F. Supp. 3d 731, 759 (N.D. Ill. 2019). Last year, the same court granted a preliminary injunction enjoining the IDOC's host-site policies. *Stone v. Jeffreys*, No. 21 C 5616, 2022 WL 4596379 (N.D. Ill. Aug. 30, 2022).

¶ 16                                            C. Postconviction Proceedings

¶ 17    In the *pro se* postconviction petition he filed on May 6, 2018, Mr. Shaw alleged that his guilty plea "was not intelligently entered [into] with full knowledge of the consequences" because, although the circuit court advised him that his new plea "[would] not change his out date," it "clearly did." Mr. Shaw explained that, as of the filing of his petition, he was still in prison 17 months after his initial release date of September 24, 2014. Mr. Shaw would remain in prison for over 4½ years beyond that date, or until May 8, 2019, a fact that he asserts in his appellate brief, that the State does not contradict, and that we have confirmed by our own review of the IDOC website. See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29 (noting that this court may take judicial notice of information appearing on the IDOC website).

¶ 18    Mr. Shaw explained in his petition that on the date he completed his agreed-to prison term, he was "violated upon release" by the IDOC for not having an approved host site. He contended that the two-year MSR term he had initially received "would have allowed him to be released from I.D.O.C. custody when [the] M.S.R. expire[d]." The open-ended term of three years to life that he ultimately received, however, meant that he could be held indefinitely. Mr. Shaw alleged that the circuit court judge had failed to properly admonish him and had in fact provided him with incorrect responses to his questions.

¶ 19    Mr. Shaw claimed that his plea counsel was also ineffective for failing to understand or explain to him that he could remain in prison indefinitely. He alleged that when he told his lawyer that he was concerned about the possibility of serving a term of MSR that was "for life," she told

him that that would only apply if he "[caught] violent offenses *** while on parole or [caught] more cases in custody before [he] reach[ed] his out date." Because he was "no serial rapist," she assured him that he would "only do the 3 years of the M.S.R."

¶ 20    Mr. Shaw also alleged that his counsel downplayed the onerous nature of the restrictions that would apply to him as a sex offender, "lead[ing] [him] to believe it wasn't a difficult process" and that he would only be required to go to the police station once a year and avoid children with whom he was not related. He did not understand that he would not be allowed to reside anywhere there was Internet or a smartphone and, since his case had nothing to do with a child, he did not think he would be subjected to the rules involving proximity to minors. Mr. Shaw explained that his counsel was reluctant to discuss the fact that he was charged with a sex offense while they were in the holding area because it could provoke other inmates to become hostile with him, but he faulted her for not furnishing him with a copy of the applicable rules "and let[ting] him decide if that's something he would want to plea to for the rest of his life."

¶ 21    Mr. Shaw alleged that he had no family member to live with upon release from prison and had planned instead to "start clean from a shelter [or] halfway house." He alleged in his petition that the evidence against him was not strong because he had a plausible defense of consent and maintained that he would never have pleaded guilty if he had known that he would be subject to requirements that were "impossible to follow" and that he could be held indefinitely while his proposed MSR host sites were considered and rejected by the IDOC.

¶ 22    The circuit court summarily dismissed Mr. Shaw's petition on June 10, 2016. The court stated that the record rebutted Mr. Shaw's claim that he was not properly admonished regarding his term of MSR. The court acknowledged that it had initially given Mr. Shaw an incorrect term of two years of MSR but concluded the hearing transcript showed that a correction was made, Mr.

9

Shaw was told his term of MSR would instead be three years to life, with release determined by the PBR, and Mr. Shaw had clearly agreed to plead guilty on those modified terms. The court did not address Mr. Shaw's argument that its admonishments should have included some explanation of the possibility that he could be incarcerated beyond the five-year prison term he agreed to if he could not find an approved host site.

¶ 23    Mr. Shaw appealed that ruling, and on January 18, 2019, we granted the State's motion for summary disposition of the appeal and to remand for second-stage proceedings. *People v. Shaw*, No. 1-16-2057 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The public defender was appointed to represent Mr. Shaw and filed a supplemental petition on his behalf.

¶ 24    The State moved to dismiss the petition, as supplemented, arguing that due process required no admonishments beyond those found in Illinois Supreme Court Rule 402 (eff. July 1, 2012), with which the circuit court had substantially complied. And even if counsel had failed to inform Mr. Shaw that he would need to have an approved host site to be released on MSR, the State argued that Mr. Shaw's bare assertion that he would not have pleaded guilty if so informed was insufficient to establish prejudice.

¶ 25    The circuit court granted the State's motion to dismiss Mr. Shaw's petition in a written order entered on August 12, 2022. The court again noted both that the mistake in the admonishments concerning the length of Mr. Shaw's MSR period had been corrected and that Mr. Shaw had agreed to continue with his guilty plea in light of that correction. The court concluded that Mr. Shaw's guilty plea was made knowingly and voluntarily, and it rejected as conclusory his argument that his counsel had failed to properly advise him.

¶ 26    This appeal followed.

¶ 27                                    II. JURISDICTION

¶ 28    The circuit court dismissed Mr. Shaw's postconviction petition at the second stage on August 12, 2022, and Mr. Shaw filed a timely notice of appeal from that ruling on August 26, 2022. We have jurisdiction over this appeal, pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 (eff. Mar. 12, 2021) and 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 29                                    III. ANALYSIS

¶ 30    Mr. Shaw contends, and the State does not argue otherwise, that the IDOC would only approve a host site for him to serve his term of MSR if that location "(1) ha[d] no other sex offenders living on the premises; (2) ha[d] a working telephone land line to comply with electronic monitoring; (3) [was] not within 500 feet of a school, park, playground, or day care center; and (4) [did] not have a computer or smart phone with internet capabilities." Mr. Shaw asserts that with no money or home of his own, no family member willing to forego Internet access, and no halfway house or transitional housing facility willing to take in a convicted sex offender, he was unable to secure a compliant host site at which to serve out his term of MSR. He alleged that this led him to be violated at the door and, ultimately, to serve over 4½ additional years beyond his prison sentence. Mr. Shaw alleged that neither the circuit court nor his counsel advised him that he could be incarcerated indefinitely if he was unable to find an approved host site and that he would have elected to go to trial if he had been made aware of that possible consequence of his plea because he had a viable defense of consent. He argues on appeal that his petition should not have been dismissed because he made a substantial showing that he was denied due process and received ineffective assistance of counsel.

¶ 31    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2020)) allows a criminal defendant to attack a prior conviction by establishing that it was the result of a substantial deprivation of rights afforded by the United States or Illinois constitutions. The Act establishes a three-stage process for the adjudication of postconviction petitions. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the circuit court independently assesses the petition to determine whether the allegations contained in it, when liberally construed and taken as true, present the gist of a constitutional claim. *Id.* If so, the petition advances to the second stage, where counsel is appointed to represent the defendant and, if necessary, to file an amended petition. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996); 725 ILCS 5/122-4, 122-5 (West 2020).

¶ 32    At the second stage, the State must either move to dismiss or answer the claims in the petition. *Gaultney*, 174 Ill. 2d at 418. Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will that claim proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2020). The court engages in no fact-finding or credibility determinations at the second stage but takes as true all allegations not affirmatively rebutted by the record. *People v. Dupree*, 2018 IL 122307, ¶ 29. It is concerned with "the legal sufficiency of the petition's well-pled allegations of a constitutional violation"—*i.e.*, whether the allegations "if proven at an evidentiary hearing, would entitle [the] petitioner to relief." (Internal quotation marks omitted.) *Id.* Our review of the dismissal of a postconviction petition at the second stage is *de novo*. *Id.*

¶ 33                                 A. Due Process

¶ 34    We first consider Mr. Shaw's claim that the circuit court's admonishments at his plea hearing caused him to enter a plea of guilty that was not made knowingly and intelligently, thus denying him due process. Our supreme court has noted that "[f]undamentally, plea agreements are

contracts, and principles of waiver apply equally to them." *People v. Jones*, 2021 IL 126432, ¶ 21. A defendant who pleads guilty to a criminal offense "waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to a trial by jury, and his right to confront his accusers." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). To be valid, such a waiver must be the "intentional relinquishment or abandonment of a known right or privilege." (Internal quotation marks omitted.) *Id.* If a defendant's guilty plea is not both voluntary and knowing, "it has been obtained in violation of due process and is therefore void." *Id.*

¶ 35 Rule 402, adopted to ensure compliance with these due process requirements, provides that a court shall not accept a guilty plea without first addressing the defendant in open court and informing him of and determining that he understands "the nature of the charge," the "minimum and maximum sentences prescribed by law," that he has the right to plead not guilty, and that by pleading guilty he will be waiving his rights to a trial by jury and to be confronted by the witnesses against him. Ill. S. Ct. R. 402(a)(1)-(4) (eff. July 1, 2012). Our supreme court has made clear that "substantial compliance with [Rule 402(a)] is sufficient to satisfy due process." *People v. Burt*, 168 Ill. 2d 49, 64 (1995).

¶ 36 Mr. Shaw does not dispute that the circuit court in this case gave him the admonishments set out in Rule 402(a). He argues that the court should additionally have explained to him that once he finished his five-year prison term, he could be "violated at the door" and remain in prison indefinitely if he was unable to secure an approved host site at which to serve his term of MSR.

¶ 37 The State argues that the court has no obligation to inform a defendant pleading guilty of the collateral, as opposed to the direct, consequences of that plea. Our supreme court has explained the difference between the two. "[A] direct consequence of a guilty plea is one which has a definite, immediate and largely automatic effect on the range of a defendant's sentence." *People v. Hughes*,

13

2012 IL 112817, ¶ 35. A collateral consequence, by contrast, is one that " 'results from an action that may or may not be taken by an agency that the trial court does not control.' " *Id.* ¶ 36 (quoting *People v. Delvillar*, 235 Ill. 2d 507, 520 (2009)). Examples of collateral consequences include "loss of employment, loss of voting rights, license suspension, and dishonorable discharge from the military." *Id.*

¶ 38     The State is correct. The IDOC's turnaround practice was a collateral consequence of Mr. Shaw's guilty plea. And as our supreme court made clear in *Hughes*, the circuit court is simply not required to independently advise a defendant of the "numerous and unfor[e]seeable" collateral consequences of a guilty plea before accepting that plea. *Id.* ¶ 36. At argument in this court, counsel for Mr. Shaw did not dispute either of these points.

¶ 39     Instead, counsel argued that Mr. Shaw was denied due process because the circuit court judge not only failed to inform him of this serious collateral consequence of his plea, but "affirmatively misadvised" him of it in response to his repeated questioning. Our supreme court has recognized, albeit in a different context, that failing to advise a defendant of the collateral consequences of a guilty plea and affirmatively misleading him regarding the nature of those consequences are different.

¶ 40     In *People v. Correa*, 108 Ill. 2d 541, 544 (1985), the defendant pleaded guilty to a drug charge, served his prison sentence, and was thereafter taken into custody by federal immigration agents. He filed a postconviction petition seeking to set aside his guilty plea, on the grounds that his counsel had misinformed him of the immigration consequences of his plea, and he was granted that relief. *Id.* The State appealed, and both this court and our supreme court affirmed. *Id.* at 544, 553. *Correa* was, in our supreme court's words, "not [a case] in which counsel simply failed to advise the defendant of the collateral consequence of deportation" but one where "the defendant

14

specifically asked counsel's advice on the question" (*id.* at 550) and received "unequivocal, erroneous, misleading representations" in response (*id.* at 552). Although plea counsel had said he " 'didn't know' " what federal immigration authorities would do in response to a guilty plea and he " '[didn't] think' " the defendant had anything to worry about, when the defendant explained that his wife was an American citizen, counsel affirmatively told him that a plea of guilty would not affect his immigration status. *Id.* at 547-48. That advice was "erroneous and misleading," and it was obvious to the *Correa* court from the defendant's repeated questions that his immigration status was "a prime factor in making his decision whether to plead guilty." *Id.* at 553.

¶ 41 Although *Correa* involved the advice of counsel rather than admonishments by the court, the court's analysis supports Mr. Shaw's due process claim here. At the time *Correa* was decided, the United States Supreme Court had not yet decided *Padilla v. Kentucky*, 559 U.S. 356, 360 (2010), which, as discussed in more detail below, held that lawyers have a sixth amendment responsibility to advise their non-citizen clients of the deportation consequences of a guilty plea. Thus, the court recognized in *Correa* that a claim that a guilty plea is involuntary can rest on erroneous and misleading advice, even where there would be no independent duty to advise the defendant of that consequence.

¶ 42 Here, Mr. Shaw maintains that the circuit court judge repeatedly and erroneously assured him that the change to his MSR term—from two years to three years to life—would have no effect on his "out date." When Mr. Shaw's counsel interjected, explaining that Mr. Shaw was in fact asking if the change to his MSR term would "change[ ] his time served in custody," the court unequivocally responded "No. It does not. *** It changes your parole period." That was not true. Under the finite, two-year term of MSR Mr. Shaw originally received, even if he was violated at the door, the longest he could have remained incarcerated following his prison term would have

15

been two years. The change from a two-year term of MSR to one of three years *to life* opened up the possibility that Mr. Shaw could instead be held indefinitely. In fact, because of the modification to an open-ended MSR term, Mr. Shaw spent over 4 ½ additional years in custody after serving his five-year sentence. The amount of time he could spend in prison was a fact that Mr. Shaw was clearly concerned with, on which he repeatedly sought clarification from the court, and on which he was affirmatively given wrong information.

¶ 43    The State does not dispute that this exchange took place. Nor does it argue that a direct misrepresentation by the court regarding a collateral consequence of a guilty plea can never render such a plea involuntary. The State's position is that the circuit court's answer to Mr. Shaw's question was not a misrepresentation at all; that it should be read narrowly to relate only to the five-year prison term the court itself was authorized to impose. That cannot be, however, because the entire discussion was prompted by the change from a finite to an open-ended term of MSR and Mr. Shaw's specific question about whether that could impact the amount of time he spent in custody. Mr. Shaw's understanding of that change was clearly the focus of the discussion.

¶ 44    We likewise reject the State's suggestion that Mr. Shaw's guilty plea was still voluntary because he did not independently research the issue and file a timely motion to withdraw his plea. Mr. Shaw alleged in his petition that he had no reason to believe he would not be released at the end of his prison term until the conclusion of that term drew near.

¶ 45    We find that Mr. Shaw has made a substantial showing that his guilty plea cannot be considered voluntary under these circumstances. His claim that he was denied due process should proceed to a third-stage evidentiary hearing.

¶ 46                              B. Ineffective Assistance of Counsel

¶ 47    Having determined that a third-stage evidentiary hearing is necessary, we consider next

16

whether Mr. Shaw's claim of ineffective assistance of counsel should also be a subject of that hearing. See *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 34 (noting that "[t]he circuit court must consider, at a third-stage evidentiary hearing, the merits only of those claims on which a petitioner has made a substantial showing of constitutional error at the second stage").

¶ 48    The sixth amendment to the United States Constitution "guarantees a defendant the right to effective assistance of counsel at all critical stages of the criminal proceedings, including the entry of a guilty plea." *Hughes*, 2012 IL 112817, ¶ 44. To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that (1) his "counsel's performance fell below an objective standard of reasonableness" and (2) "that he was prejudiced as a result of [that] deficient performance." (Internal quotation marks omitted.) *People v. Valdez*, 2016 IL 119860, ¶ 14 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "A showing of prejudice requires proof of a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694).

¶ 49    Until recently, many state and federal courts examining postconviction claims regarding the validity of guilty pleas, including those in Illinois, applied the same test for ineffective assistance of counsel claims as for due process claims, holding that plea counsel was simply not required to advise a client of the collateral consequences of a guilty plea. *Hughes*, 2012 IL 112817, ¶ 45. Mr. Shaw is correct, however, that narrow exceptions to this general rule have recently been recognized.

¶ 50    In *Padilla*, 559 U.S. at 360, the United States Supreme Court held that a postconviction petitioner sufficiently alleged that his counsel was constitutionally deficient for failing to advise him that, as a noncitizen, he would face deportation if he pleaded guilty to drug-related charges. Declining to either endorse or reject the distinction relied on by the lower courts in that case

17

between direct and indirect consequences of a guilty plea, the *Padilla* court concluded that counsel had a duty to advise the petitioner that he would be subject to automatic deportation if he pleaded guilty to the offense charged. *Id.* at 365-66. Although deportation was not a criminal sanction but an indirect civil consequence of the petitioner's guilty plea, the court noted that it was "a particularly severe 'penalty' " that could not easily be divorced from the conviction itself. *Id.* Acknowledging that in some cases the risk of deportation would not be so clear, and the duty of counsel would thus be more limited, the court concluded that plea counsel in that case could easily have determined that the petitioner's plea would make him eligible for automatic deportation by reading the text of the statute. *Id.* at 369. And counsel should have known that preserving the petitioner's right to remain in the United States might be more important to him than any potential prison sentence. *Id.* at 368.

¶ 51    Not long after *Padilla* was decided, our own supreme court considered in *Hughes* whether plea counsel had a duty to advise the defendant in that case of the possibility that, at the conclusion of his prison term, he could be civilly committed for an indeterminate period of time if the State elected to file a petition under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2006)). *Hughes*, 2012 IL 112817, ¶ 33. The *Hughes* court summarized the holding in *Padilla* as follows: "*Padilla* commands that where consequences are severe, certain to occur, 'enmeshed' in the criminal process, and are of predictable importance to a defendant's calculus, they are not categorically excluded from *Strickland*'s purview despite being traditionally categorized as collateral." *Id.* ¶ 49. Recognizing that the possibility of involuntary commitment was "not immediate, automatic, or mandatory in the same way that deportation would be," the court nevertheless concluded that the consequence was " 'enmeshed' in the criminal process." *Id.* ¶ 50. And like deportation, the prospect of indefinite involuntary commitment was also a

18

"uniquely severe" penalty that would be of material importance to a criminal defendant deciding whether to plead guilty. *Id.* ¶¶ 51-52.

¶ 52 We agree with Mr. Shaw that, following these cases, certain consequences of guilty pleas are so severe, so certain, and so intimately related to the criminal proceedings that defense attorneys must advise their clients about them, regardless of whether they could be considered collateral as opposed to direct consequences of a conviction. We also agree that the risk of being "violated at the door" and held indefinitely beyond the conclusion of one's prison term is one such consequence.

¶ 53 The State points out that what happened to Mr. Shaw is not something that will necessarily happen to all sex offenders. Counsel here had no duty, the State argues, to advise Mr. Shaw of the mere possibility that the IDOC could, in its discretion, subject him to onerous conditions that would cause him to be violated at the door. While the State is correct that the *Padilla* court focused on deportation being an automatic consequence of the guilty plea in that case, *Hughes* expanded the scope of consequences falling within that category. Our supreme court recognized in *Hughes* that, although it was far from certain in a particular case that the State would exercise its discretion and petition for the defendant's involuntary commitment under the Sexually Violent Persons Commitment Act or that, if so, the petition would be granted, *every* person convicted of a sexually violent offense was statutorily eligible for commitment and would as a matter of course be subject to a mandatory comprehensive evaluation for commitment near the end of his or her prison term. *Id.* ¶ 50. It was thus not the certainty of the harsh penalty itself that the *Hughes* court found significant, but the certainty that the defendant would be subjected to a process that could lead to that result.

¶ 54 Here, Mr. Shaw alleged that, as a sex offender nearing the end of his prison term, he was

required to submit a release plan that included a proposed host site for his MSR term and that the IDOC, as part of its routine investigation into the compliance of such plans with a prisoner's terms of release, violated him at the door and returned him to custody, a practice that resulted in him serving almost double the prison term the court sentenced him to. It was certain, given the nature of Mr. Shaw's offense, that stringent criteria would apply to his release, that his proposed release plan would be subjected to scrutiny by the IDOC to ensure compliance with those criteria, and that his indefinite term of MSR meant there was no cap on the length of time that he could remain in prison absent an approved host site. Just as in *Hughes*, Mr. Shaw's conviction automatically subjected him to a process that could result in a truly severe penalty—an indefinite denial of his liberty. This is a consequence that, under *Padilla* and *Hughes*, was "certain to occur, 'enmeshed' in the criminal process, and *** of predictable importance to [Mr. Shaw's] calculus." *Id.* ¶ 49. Counsel's failure to warn of that consequence, though it be collateral to his conviction, is thus not categorically excluded from *Strickland*'s purview. *Id.*

¶ 55 We note also that there was something more than a bare failure to warn here. Although the record does not establish that plea counsel affirmatively misled Mr. Shaw, his lawyer did stand by and fail to correct the circuit court's misstatement when Mr. Shaw asked, quite clearly, whether the change to his MSR term would affect the amount of time he spent in prison. The court's answer, "No. It does not," was wrong because the change from two years to three years to life meant that there was no longer any cap on the time Mr. Shaw could be held in prison.

¶ 56 As both the *Padilla* and *Hughes* courts recognized, whether counsel's representation in a particular case should be deemed deficient "is a question of reasonableness" that is " 'necessarily linked to the practice and expectations of the legal community.' " *Id.* ¶ 54 (quoting *Padilla*, 559 U.S. at 366). It is also one that must be " 'viewed as of the time of counsel's conduct.' " *Id.* ¶ 61

(quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)).

¶ 57    Defense counsel oversimplified the matter, we believe, when she suggested at argument in this court that any competent counsel in 2013 could tell, simply from looking at the applicable statutes, that a client like Mr. Shaw would be subject to such onerous restrictions on where he could reside during his MSR term that he might well never be released from prison. Nowhere in the many statutory conditions imposed on sex offenders that counsel cites are those conditions framed as residency requirements that will cause the IDOC to violate an inmate at the door. Other inferences are required as well. Although the Code makes clear, for example, that sex offenders convicted of crimes qualifying them as sexual predators are subject to electronic monitoring while on MSR, it does not specify that an individual's residence must have a landline telephone for the electronic monitoring to be installed. 730 ILCS 5/3-3-7(a)(7.7) (West 2012). The Code provides that the PRB "may" require a sex offender to reside only at an IDOC-approved location while on MSR but does not expressly state that release from prison can be denied indefinitely if this condition is not met. *Id.* § 3-3-7(b-1)(1). Even the requirement that a released defendant not access or use a computer with Internet capability, which was alleged to have been imposed on any approved site for Mr. Shaw, is phrased in the statute as a restriction that the PRB *can* impose on sex offenders. *Id.* §3-3-7(b)(7.6)(i).

¶ 58    Nor are we convinced, however, by the State's insistence that plea counsel would have to be "clairvoyant" to understand that at least some inquiry and disclosure might be required in this area before an informed decision could be made on an offer to plead guilty to a sex offense. The State argues that it would be unreasonable to expect plea counsel to accurately predict what a particular defendant's financial or familial situation and ability to obtain an approved host site will be at the conclusion of his prison term. We agree. But that does not prevent an attorney from

21

advising her client about the impact of an indefinite term of MSR and the potential difficulties in obtaining a host site. Whether prevailing professional norms in 2013 would have required plea counsel to appreciate and explain turnaround practice as a serious collateral consequence of Mr. Shaw's guilty plea is ultimately a question of fact for a third-stage evidentiary hearing, but Mr. Shaw has made the substantial showing required for this claim to advance to that stage.

¶ 59    The State also argues that Mr. Shaw cannot establish the second prong of the *Strickland* test—that he was prejudiced by his counsel's failure. In the context of a guilty plea, prejudice is established where a defendant shows a reasonable probability that, but for counsel's errors, he would not have pleaded guilty but would instead have insisted on going to trial. *People v. Rissley*, 206 Ill. 2d 403, 457 (2003). A "bare allegation" is insufficient to establish this. *Id.* at 458. Rather, the defendant must present " 'either a claim of innocence or the articulation of [a] plausible defense' " that could have been raised at trial. (Emphasis omitted.) *Id.* at 460 (quoting *United States v. LaBonte*, 70 F.3d 1396, 1413 (1st Cir. 1995)). The State urges us to conclude that here, as in *People v. Tucek*, 2019 IL App (2d) 160788, a case where the same due process and ineffective assistance claims were made, prejudice has not been established.

¶ 60    Mr. Shaw's petition contained more than a bare assertion that he would have gone to trial if properly advised, however. He asserted, over approximately four to five pages of his petition, a number of facts that, if proved, would support a defense of consent. He alleged that he met A.G. at a local liquor store, that they exchanged telephone numbers, and that she texted him later that night, asking if he wanted "some real goodies" and telling him "u no wat I like, make it happen." When he asked what she meant by that she responded: "money." Mr. Shaw further alleged that A.G. agreed to let him pick her up "in the wee hours of the morning," never attempted to leave his vehicle, had access to her phone all night but never called the police or anyone for help, and

willingly got back into his vehicle with him after their encounter. He alleged that only when he paid A.G. less than she had asked for did she contact the police to say she had been assaulted. Mr. Shaw alleged that text message records would support his version of events. In contrast to the defendant in *Tucek*, who merely attacked the credibility of the complaining witness in that case, we find that Mr. Shaw has asserted a plausible defense of consent.

¶ 61    Mr. Shaw has thus made a substantial showing that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result.

¶ 62                                    IV. CONCLUSION

¶ 63    For all of the above reasons, we reverse the circuit court's dismissal at the second stage of Mr. Shaw's petition and remand for a third-stage evidentiary hearing on his due process and ineffective assistance of counsel claims.

¶ 64    Reversed and remanded.

*People v. Shaw*, 2023 IL App (1st) 221358

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-13778, the Hon. Alfredo Maldonado, Judge presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Brett C. Zeeb, of the State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Erin K. Slattery, and Kimberly C. Reeve, Assistant State's Attorneys, of counsel), for the People. |