NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250442-U

NO. 4-25-0442

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 16, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| VENANCIO JAIMES-CONEJO, | ) | No. 17CF146 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed the trial court's denial of defendant's motion to withdraw his guilty plea.

¶ 2     In May 2017, the State charged defendant, Venancio Jaimes-Conejo, with three counts of aggravated criminal sexual abuse, a Class 2 felony (720 ILCS 5/12-16(c)(1)(i) (West 2004)), and a warrant issued for his arrest. The charges alleged that between January 2005 and December 2006, defendant committed acts of sexual conduct upon D.G.C., who was under 13 years old at the time, by (1) fondling her breast, (2) touching her vagina, and (3) making her touch his penis. In August 2017, a grand jury returned a bill of indictment with the same charges. In September 2023, defendant was arrested on the warrant that had previously issued.

¶ 3     In December 2024, the State filed a fourth count, aggravated battery on a public way, a Class 3 felony (*id.* § 12-4(b)(8)), to which defendant pleaded guilty pursuant to a fully

negotiated plea agreement. Under that agreement, the State would dismiss the remaining charges, and defendant would receive a sentence of 30 months of probation.

¶ 4 In March 2025, defendant filed a motion to withdraw his guilty plea, alleging that he did not knowingly, intelligently, and voluntarily waive his rights to trial and plead guilty, nor did he fully understand or comprehend the admonishments of the trial court. Following an April 2025 hearing, at which defendant testified, the court denied the motion.

¶ 5 Defendant appeals, arguing (1) the trial court erred by denying his motion to withdraw his guilty plea, (2) defense counsel failed to comply with Illinois Supreme Court Rule 604(d) (eff. Apr. 15, 2024) by failing to adequately present his claims regarding the adequacy of the interpreter and the immigration consequences of his plea, and (3) the court erred by allowing the motion to withdraw the guilty plea hearing to proceed without an interpreter. We disagree and affirm.

¶ 6 I. BACKGROUND

¶ 7 A. The Charges

¶ 8 In May 2017, the State charged defendant with three counts of aggravated criminal sexual abuse, a Class 2 felony (720 ILCS 5/12-16(c)(1)(i) (West 2004)), and a warrant issued for his arrest. The complaint alleged that between January 2005 and December 2006, defendant committed acts of sexual conduct upon D.G.C., who was under 13 years old at the time, by (1) fondling her breast, (2) touching her vagina, and (3) making her touch his penis. In August 2017, a grand jury returned a bill of indictment with the same charges. In September 2023, defendant was arrested on the warrant that had previously issued.

¶ 9 B. The Guilty Plea Hearing

¶ 10 In December 2024, the trial court conducted a plea hearing, at which defendant, a

- 2 -

native Spanish speaker, through interpreter Margaret Mujica-Ruiz, pleaded guilty pursuant to a fully negotiated plea agreement. The court began the hearing by stating the following:

> "The state's attorney just handed me an Information, a Count IV, which appears to be a lesser included of aggravated battery on or about a public way, alleging that the defendant had made physical contact of an insulting or provoking nature with an individual with the initials DGC, whose date of birth is January 27th of 1996, that the event took place somewhere between January 1st, 2005, and December 31st of 2006. The act in question is that it's alleged that he placed his hand on the breast of that individual. It's a Class 3 felony."

¶ 11 The trial court asked the State about the terms of the plea agreement, and the State replied that in exchange for defendant's guilty plea to count IV, he would receive 30 months of probation and the other charges would be dismissed.

¶ 12 The trial court asked defendant if he understood the plea agreement that he had just heard, and defendant answered, "Yes." The court then admonished defendant as follows:

> "What you'd be pleading guilty to is Count IV of 17-CF-146 as set out in the Information filed here today alleging that it's a Class 3 felony, aggravated battery, on or about a public way, the contact being of insulting or provoking in nature, alleging that you placed your hand on the breast of DGC, that this occurred between January 1 of 2005 and December 31, 2006. The maximum sentence on something like this would be two to five years in the Department of Corrections followed by six months of mandatory supervised release."

¶ 13 Defendant stated that he understood what the trial court had said thus far.

¶ 14 The State then provided the following factual basis for the plea:

"On October 21st, 2014, DGC, whose date of birth is January 21st, 1996, met with Officer Wilgus of the Belvidere Police Department. DJC [*sic*] advised she was not sure how old she was, but she thought it was around 10 years old when she was touched inappropriately by a male who lived with her family *** here in Belvidere. She specifically recalls her father's cousin placing his hand on her breast.

She further stated she entered counseling at 13 years old but stopped going; however, she had then recently started seeing another counselor who asked if she had ever reported it to the police. She stated that she had not and that is why she came to the police that day. Officer Wilgus spoke to DGC's mother, who initially thought the suspect's name was Benancio, B-e-n-a-n-c-i-o, Jaimes. And she also believed that he had been deported. Thus, they were able to narrow down the dates they lived [at the house in Belvidere] was between January 1st, 2005, and December 31st, 2006.

Detective Bird was assigned to follow up on the investigation. He was able to determine that the correct spelling of the suspect's name was Venancio with a V. Detective Bird then made numerous attempts to locate the defendant and in May of 2015 learned that the defendant had been deported to Mexico on January 24, 2014.

For purposes of this plea, Judge, I believe the parties are stipulating that the offense as charged in Count IV occurred while the defendant and victim were on or about a public way."

¶ 15    The trial court asked defendant whether, having heard the allegations, he wished

to plead guilty. Defendant answered in the affirmative.

¶ 16    The trial court then admonished defendant as follows:

"I have to give certain admonishments to everybody. Some of these might apply to you, some might not, but, again, I'm required to give them to everybody. To begin with, if you are not a citizen of the United States, you are hereby advised the conviction of the offense for which you've been charged may have the consequences of deportation, exclusion from admission to the United States, or a denial of naturalization of the laws of the United States. Also, as a consequence of a conviction or a plea of guilty, the sentence for any future conviction may be increased, or there may be a higher possibility of the imposition of consecutive sentences. There may be registration requirements that restrict where you may work, live, or be present; and there may be an impact on your ability to retain or obtain housing in the public or private market; retain or obtain employment; and retain or obtain a firearm, an occupational license, or a driver's license."

¶ 17    The trial court then admonished defendant of his right to a trial, and defendant affirmed he was giving up that right voluntarily by pleading guilty. Defendant said he had the opportunity to speak with his attorney and was satisfied with his representation.

¶ 18    The following colloquy then ensued:

"THE COURT: Also, I just want to give you one final thing. I don't know—immigration law normally in this country is sometimes kind of all over the place. We go through periods of times where it's enforced more seriously and strictly. Other times it's a little more lax. I would anticipate that come January with new administration coming in that it's going to be more difficult. And really

any advice that Attorney Braun or any other attorney would give you as to whether or not you might be deported based upon this or any of your prior criminal history, really it's just probably a guess. Do you understand that so far?

[DEFENDANT]: I don't understand.

THE COURT: So, the new president that will come in and be sworn in at the end of January has run on a promise to deport as many people here that are not here legally. I don't know what kind of power he has to do that. I don't know how serious he is about that, but I think—I don't think any attorney really knows or can give any advice that you can hang your hat on as to how this event today will affect what soon-to-be President Trump is planning to do with deportations. That's it. Do you understand?

[DEFENDANT]: Yes.

THE COURT: I have no clue. Make sense?

[DEFENDANT]: Yes.

THE COURT: Okay. Knowing all that, do you still want to plead guilty?

[DEFENDANT]: Yes.

THE COURT: Okay. Court will accept the plea of guilty and find that the defendant has been advised of his rights. He understands them. He also understands the consequences and the possible punishments and persists in pleading guilty. The Court further finds the factual basis for the plea, that the plea was made voluntarily and without any threats or promises other than contained in the plea agreement."

¶ 19    The trial court sentenced defendant to 30 months of probation, consistent with the

plea agreement. When doing so, the court remarked, "So I'll agree with this [plea agreement]. I think there's a little bit given up by both sides. The defendant claims his innocence from the very start. He's given up that innocence. He's got a more favorable disposition here. And, so, *** I think this is an appropriate sentence." The court then noted as follows:

"Also, I've marked in here, too, realizing that he's got a Lake County hold, normally we'd have somebody report directly once you get released here right over to Probation. You can't do that. You will already be brought to Lake County first. So, what I did mark in here is you are to contact the Boone County Probation Department within seven days of being released from Lake County. So once they get you to Waukegan to arrest for whatever that warrant is and once you get released in Waukegan, you've got to call Probation here and schedule whatever kind of appointments that they need to get the paperwork signed to transfer your probation from Boone County to Lake County."

¶ 20    Defendant remarked, "So I won't be released from here today?"

¶ 21    The trial court responded,

"I can't do that if there's a hold from Lake County. If there's a hold from Lake County, I can't release you. I can release—I can vacate warrants that are in Boone County. I can't do it for the out of county, so if there is a valid warrant from Lake County, Lake County will come get you and bring you in front of a judge there within the next five days. If you are still here on day six, they will release you here, and they'll give you a new court date that you'll need to show up to in Lake County. What I just want to make sure is that once you are out of custody completely, you're out of Boone, you're out of Lake, you are walking

around, within seven days I need you to call Boone County Probation and schedule an appointment so they can transfer your probation from Boone County to Lake County."

¶ 22 Defendant then answered a series of questions about where he would be living upon his release from jail and the contact information for his release.

¶ 23 C. The Post-Guilty Plea Proceedings

¶ 24 1. *The Motion To Withdraw the Guilty Plea*

¶ 25 In March 2025, defense counsel filed a motion to withdraw defendant's guilty plea, which read as follows:

"1. The defendant did not knowingly, intelligently, and voluntarily waive his rights to trial and plead guilty, nor did the defendant fully understand or comprehend the admonishments of the Court pursuant to Supreme Court Rule 402 at the time of the entry of the plea of guilty in that;

A. defendant submits he was forced to plead guilty to escape the unjust conditions in the Boon[e] County jail of repeatedly being placed in segregation without cause, and

B. defendant submits the court interpreter did not accurately interpret the words of the court at the time of the guilty plea, and

C. defendant submits he is innocent of the charges."

¶ 26 2. *The Motion Hearing*

¶ 27 In April 2025, the trial court conducted a hearing on defendant's motion to withdraw his guilty plea. At the beginning of the hearing the court addressed interpreter Ashley Lilon, stating, "Ashley, this is where we're going to need you for interpreting." Defense counsel

responded to the court, and the following colloquy occurred:

> "[DEFENSE COUNSEL]: Judge, if I could request, at least initially, if we can proceed without the help of an interpreter?
>
> THE COURT: You don't think he needs one?
>
> [DEFENSE COUNSEL]: I think initially I'd like to go through the foundation of that, yes, please.
>
> THE COURT: Okay. I'll let you—let me know when you think he needs the interpreter.
>
> So bear with us a second, Ashley. I think he's going to try to go in English for a little bit."

¶ 28    Defendant was then sworn in and began his testimony.

¶ 29    a. Defendant

¶ 30    Defendant testified he had been incarcerated in the Boone County jail for at least a year before pleading guilty. Prior to his plea, defendant and defense counsel met multiple times to discuss the case, including alleged inconsistencies in the victim's allegations, and defendant believed his case for trial was particularly strong. Over time, the State made several plea offers, initially proposing a four-year prison sentence. Ultimately, defendant pleaded guilty to an amended charge in exchange for a sentence of probation that did not require him to register as a sex offender. He later called his attorney about withdrawing his guilty plea. He explained generally that he believed the interpreter did not correctly interpret what the trial court stated during the guilty plea, especially those things relating to the immigration consequences.

¶ 31    Defendant further testified regarding the conditions of the Boone County jail while he was incarcerated. Defendant stated that he was frequently moved between housing

blocks in the jail and did not understand why. He was disciplined numerous times for a variety of reasons, such as his failing to return to his cell at lockdown. Defendant believed that he had not been treated fairly because he was out of his cell cleaning up water from the showers that would cause other inmates to slip.

¶ 32    Defendant stated as follows:

"So next time when I get in the shower, I get late the day because I'm up. Next time I go to my cell and get dressed and come back in with my own towel and clean the water, and I get late three minutes and I get disciplinary for that three minutes when I try to clean it because I almost got in a fight because the other guy slip in the water."

¶ 33    Defendant maintained his innocence and said he believed that he would win at trial at the time he pleaded guilty. Defendant testified as follows:

"I explained to you, too, how they treated me and how they put me in the cell for no reason. They put me 72 hours in the cell, but I got a human poo on the ceiling and I tried to clean it. A piece is coming in my head and I had to eat like that, sleep like that, 72 hours. And I talked to the Sgt. Phillips and he laughing at me. So they give me 300 milligrams of Seroquel to try to kill me."

¶ 34    Defendant stated that he was unfairly treated because he was disciplined for fighting, but he did not start the fights and inmates came to his cell to fight him. He said that he "cannot be in there no more." He believed that he had to plead guilty to get released in order to survive.

¶ 35    On cross-examination, the State asked defendant whether he understood what he had been asked on direct examination, to which he replied in the affirmative. He said that he

participated in multiple hearings without an interpreter. Regarding understanding the possible immigration consequences of his guilty plea, including deportation, defendant said as follows:

"There's a deportation there sometimes too, when the Judge speak something and started speaking and [the interpreter] started, told me, and you continue so she even stopped because you continue. And I looking to him, looking to you, and looking to her. Even sometimes the Judge I see when he's looking to me like he no understand what we talking about. I even look to the guy that typed it, too, like, okay, what was going on? But I keep it quiet because you continue—sometimes I say, I raised my hand and the judge said, talk to your attorney. So, I want to say, excuse me, I don't understand this part, but talk to the attorney. And I told [defense counsel] one time, too, when there's a guy, he interpreted me, I go like there's any way him—he can interpret me because he go a little bit more fast. She interpreted me fine, but the guy, he go a little bit more fast, close to my ear. Whatever the judge said, he's right here. Told me. And when judge stop and you going, he stopped, too. And he going when you started, he started going, too. And I understand that's more better that how she—not really hearing what she said and I get confused."

¶ 36　　　　Defendant confirmed that at the guilty plea hearing, he had stated he was pleading guilty voluntarily and that no one had forced him to plead guilty. However, he said that the judge had not noticed his "reaction," and he had been unfairly disciplined and the conditions were poor in the Boone County jail. When he complained to the jail personnel about the conditions, he had been told that the trial court had nothing to do with his discipline in jail. Defendant stated, "So they forcing me to plea bargain."

¶ 37    The State asked defendant, "So what you're saying is when you told the Court that, you were lying?" He responded, "Basically, they forced me to lying." Defendant acknowledged that he did not have difficulty (1) understanding all the English being spoken at the motion hearing or (2) expressing himself in English.

¶ 38    The trial court asked defendant if he understood that he would go back to jail if the court granted his motion to withdraw the guilty plea, and further, that if he was convicted of the sex offenses, he would face prison time. Defendant stated the following:

> "Yeah, I understand that. The only thing that I feel more comfortable, Your Honor, that all my family they already know how I get treated inside. So, anything happen to me, my family already know what going on.
>
>     ***
>
> That's the only thing. Because before you can say you not believe that, but before I send the letters mailed out to my family, my family never get it. Why? I don't know. The mail got lost on the way home."

¶ 39    The trial court asked one more time to make sure that defendant understood the consequences of withdrawing his guilty plea, to which defendant said he did. Defendant explained: "Your Honor, there's no other way to prove my innocence. I try one year and three months to try to prove my innocence, and I'm not getting nowhere."

¶ 40                            b. Stipulated Jail Records

¶ 41    The parties stipulated to the admission of records from the jail. Those records showed that defendant had been moved 17 times while in the county jail for a variety of reasons. One move was due to safety concerns: "A detainee from K-Block wrote a letter to sergeant stating it would be in the detainee's best interest to move him since they found out about his

charges." Defendant was later moved to "isolation per detainee request—Feared safety regarding his charges." The records also showed there were disciplinary issues, such as "Passing notes during court, lying, ongoing issues," "fighting," and items such as "fruit fermenting, screw and tons of books" in his cell. In one instance, a corrections officer wrote that defendant had an argument with another inmate, which resulted in defendant punching the other inmate in the face. In December 2024, defendant was sent to isolation for 72 hours "for rule violations." According to a document, these rule violations included staying in the "dayroom" past his lock up time; he had already been locked down for the same violation the previous month, and he was warned twice before that.

¶ 42                                    c. Interpreter's Testimony

¶ 43        The State then called Mujica-Ruiz, who served as the interpreter at the guilty plea hearing. She testified that she had been an interpreter for 21 years and had interpreted everything said by the parties and the trial court accurately. She also interpreted two or three meetings between defense counsel and defendant at the beginning of counsel's representation. She stated that during the guilty plea hearing, defendant "did more than once turn around and kept talking to his attorney throughout the sentencing," "so if he didn't hear something or understand, it was probably because he was going back and forth from talking to his attorney while going through the plea."

¶ 44                                    3. *The Trial Court's Decision*

¶ 45        The trial court then ruled as follows:

> "I'm going to find that certainly I think from the very beginning of that plea to the very end of that plea, everybody understood that to be an *Alford* plea. [(An *Alford* plea refers to a guilty plea made by a defendant who nonetheless

- 13 -

maintains his innocence. See *North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970)).] I think that he had to weigh his belief that the evidence—he believed in his own innocence. At the same time, he felt it was better for him understanding that there's a chance that he could have been found guilty with a whole bunch of ramifications there on the eve of a new administration, which it was anticipated would do some significant changes to immigration and went way beyond what anybody could have imagined immigration law to be. So anything I said regarding the possibility of that happening may have underestimated what happened is happening over the course of the three following months. I think it's pure *Alford* plea. He understood. He got something out of it. He got, first of all, it was amended from a sex offense case to a non-sex offense case so that he was no longer having to register as a sex offender. Certainly, for immigration purposes he would stand a better chance of not incurring any consequences with a non-sex offense case versus a sex offense case.

In addition, not knowing what the new administration would do regarding people that were facing potential deportation issues and who are currently sitting in the jail seem to be a—sitting in a bucket. That's the easiest place for people—for ICE to come find people is in the jail. They don't have to go knock on any doors. All those things are real things that have happened.

So, again, I think it's just an *Alford* plea. Every *Alford* plea, one was going to have some doubts after the fact. It would sure be nice to know what a jury would have thought. But I don't look at what he wants to do today or on March 19 when the motion was filed. I look at what happened on December 11. December

11, that was from the very start to the end an *Alford* plea. There was nothing that he didn't understand. He knew what was going on. There was no force imposed. Sure, he wanted out, but it was voluntary. We had a trial set for February 3rd, I believe. So roughly about two months later, we would have had a trial. And that was his choice. Is it buyer's remorse? I don't know. Could be. But, ultimately, that is the bargain reached. I think it was a fair one. Nobody was forced to. He understood exactly what was going on. There was no language issue. And, so, I'm going to deny the motion to withdraw his plea of guilty. The conviction will stand."

¶ 46        This appeal followed.

¶ 47                            II. ANALYSIS

¶ 48        Defendant appeals, arguing (1) the trial court erred by denying his motion to withdraw his guilty plea, (2) defense counsel failed to comply with Illinois Supreme Court Rule 604(d) (eff. Apr. 15, 2024) by failing to adequately present his claims regarding the adequacy of the interpreter and the immigration consequences of his plea, and (3) the court erred by allowing the motion to withdraw the guilty plea hearing to proceed without an interpreter. We disagree and affirm.

¶ 49                 A. Motion To Withdraw the Guilty Plea

¶ 50        Defendant first argues that the trial court erred by denying his motion to withdraw his guilty plea. He contends that his plea was involuntary due to the conditions of the jail in which he was incarcerated being so poor that he was coerced into pleading guilty. We disagree.

¶ 51               1. *The Applicable Law and the Standard of Review*

¶ 52        "A defendant does not have an automatic right to withdraw [his] guilty plea, as

'[a] plea of guilty is a grave act that is not reversible at the defendant's whim." *People v. Burge*, 2021 IL 125642, ¶ 37. "In order to withdraw his plea, a defendant must establish a recognized basis for such withdrawal." *People v. Millsap*, 2022 IL App (4th) 210192, ¶ 17. "Withdrawal is appropriate where the plea was entered through a misapprehension of the facts or of the law or where there is doubt as to the guilt of the accused and justice would be better served through a trial." *People v. Hughes*, 2012 IL 112817, ¶ 32.

¶ 53        When a defendant claims that he pleaded guilty solely to get out of jail, it is important for courts to remember that a guilty plea is not invalidated merely because it was motivated by the defendant's desire to get out of jail and to be put on probation. A defendant must "demonstrate a necessary nexus between the alleged coercive conditions at the jail and his guilty plea." *People v. St. Pierre*, 146 Ill. 2d 494, 508 (1992). That is, he must show a "specific instance of abuse, either physical or mental, or coercion which would have caused him to plead guilty." *Id.*

¶ 54        "[T]he decision to grant or deny a motion to withdraw a guilty plea rests in the sound discretion of the circuit court and, as such, is reviewed for abuse of discretion." *Hughes*, 2012 IL 112817, ¶ 32. " 'An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court.' " *Millsap*, 2022 IL App (4th) 210192, ¶ 18 (quoting *People v. Delvillar*, 235 Ill. 2d 507, 519-20 (2009)).

¶ 55                                2. *This Case*

¶ 56        Defendant argues that the record reflects that "he feared for his safety and decided to plead guilty despite his actual innocence due to intolerable jail conditions including other detainees learning about his charges, being given incorrect medication, and being kept in solitary

confinement for 72 hours in a cell with human feces on the ceiling." He contends that these conditions rendered his plea involuntary. We disagree.

¶ 57 Although jail conditions can be a valid basis for an involuntary plea, they do not automatically render a plea involuntary. See *St. Pierre*, 146 Ill. at 508; *People v. Urr*, 321 Ill. App. 3d 544, 547 (2001).

¶ 58 Defendant compares the present case to *Urr*. However, the present case differs fundamentally from *Urr*.

¶ 59 In *Urr*, the defendant maintained throughout the proceedings that he was innocent and that he was being physically threatened on a daily basis while in custody at the Cook County Department of Corrections. *Urr*, 321 Ill. App. 3d at 548. Further, the defendant made it clear *before* his plea was accepted that the only reason he was pleading guilty was because he had been sexually assaulted while incarcerated. *Id.* When asked by the trial court if he wished to plead guilty, the defendant responded, " 'Yes, I wish to plead guilty because I have no other choice. *** I don't want to die at this point.' " *Id.* at 546. The defendant's conditional and reluctant responses when pleading guilty supported his involuntariness claim. *Id.*

¶ 60 Regardless of defendant's assertion that the parties and the trial court all agreed that defendant was maintaining his innocence despite pleading guilty, unlike the defendant in *Urr*, the first and only indication that defendant had pleaded guilty to escape the county jail conditions surfaced during the hearing on his motion to withdraw his guilty plea. Prior to that, at the guilty plea hearing, defendant answered that (1) he understood the court's admonitions and (2) his plea was voluntary and made without threats of force.

¶ 61 In addition, defendant fails to "allege any specific instance of abuse [in the jail], either physical or mental, or coercion which would have caused him to plead guilty." *St. Pierre*,

146 Ill. 2d. at 508. Instead, defendant's claims amount to little more than dissatisfaction with the jail conditions. He claims that the nexus is evident from the proximity of his being in isolation for 72 hours to his pleading guilty, but that proximity alone is insufficient for us to conclude the trial court abused its discretion. Because the trial court had the opportunity to interact with defendant and observe him at both the guilty plea hearing and the motion to withdraw hearing, we defer to its judgment. See *People v. Deleon*, 227 Ill. 2d 322, 332 (2008) ("[W]e give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses.").

¶ 62        We also note that when the trial court asked defendant if he understood that withdrawing his guilty plea would return him to the same county jail, he responded that he did not mind going back. He explained that while he was unable to contact his family during his initial stay, they now knew what he was going through and would be aware if something happened to him. This testimony undermines his claim that he pleaded guilty simply to "survive," as it implies he would not have entered the plea had he been able to communicate with his family about the alleged abuses.

¶ 63        Further, defendant's argument that he should be allowed to withdraw his plea because he misunderstood its consequences undermines his assertion that the jail conditions coerced him. By claiming he would not have pleaded guilty had he fully understood the possible immigration consequences, defendant implicitly conceded he would have willingly remained in the jail despite the allegedly intolerable conditions.

¶ 64        This case is similar to *People v. Penrod*, 2024 IL App (5th) 220451-U, ¶¶ 25, 27, in which the appellate court concluded that the trial court did not abuse its discretion by denying a motion to withdraw the guilty plea based on the allegedly coercive jail conditions of poor

medical treatment. The court noted that at no time prior to the motion to withdraw did the defendant bring up the medical treatment she received in the jail. See *id.* ("The record clearly shows that the defendant had numerous opportunities to bring any medical concerns to the trial court's attention, but she failed to do so."). In addition, the appellate court highlighted that the defendant had a discussion with the "trial court concerning how a travel restriction as a condition of her recognizance release would adversely affect her employment," yet she did not raise the medical treatment concerns. *Id.*

¶ 65    Here, similar to *Penrod*, defendant did not bring up the conditions of the jail at any point prior to the motion to withdraw hearing, and at the guilty plea hearing, defendant did not indicate or express any concerns with his treatment in the jail. Instead, defendant simply expressed some surprise in response to finding out he would not be immediately released from jail following the court's acceptance of his guilty plea.

¶ 66    Accordingly, because we conclude that defendant has failed to show that the trial court's denial of his motion to withdraw his guilty plea was arbitrary, fanciful, or unreasonable, or that no reasonable person would take the view adopted by the court, his claim that the court abused its discretion fails.

¶ 67                B. Rule 604(d) Compliance

¶ 68    Second, defendant argues that, in the alternative, plea counsel failed to comply with Rule 604(d) by not adequately presenting his claims regarding the adequacy of the interpreter and the immigration consequences of his plea. We disagree.

¶ 69                1. *The Applicable Law and the Standard of Review*

¶ 70    Rule 604(d) governs appeals from judgments entered upon a plea of guilty. *People v. Gray*, 2023 IL App (4th) 230076, ¶ 28. It requires a defendant to file a motion to

- 19 -

withdraw his plea and vacate his sentence in the trial court within 30 days of the date on which he was sentenced. Ill. S. Ct. R. 604(d) (eff. Apr. 15, 2024). Rule 604(d) is designed both to protect a defendant's due process rights and to eliminate unnecessary appeals. *People v. Shirley*, 181 Ill. 2d 359, 362 (1998). Its purpose is to ensure that any potential errors in the entry of a guilty plea are brought to the trial court's attention before an appeal is filed. *People v. Easton*, 2018 IL 122187, ¶ 29.

¶ 71  When a motion to withdraw a guilty plea is based on facts that "do not appear of record," Rule 604(d) requires that the motion be supported by affidavits. Ill. S. Ct. R. 604(d) (eff. Apr. 15, 2024). Additionally, Rule 604(d) imposes certain requirements on counsel, including requiring counsel to file a certificate with the trial court stating the following:

> "[T]hat the attorney has consulted with the defendant either by phone, mail, electronic means or in person to ascertain defendant's contentions of error in the sentence and the entry of the plea of guilty, has examined the trial court file and both the report of proceedings of the plea of guilty and the report of proceedings in the sentencing hearing, and has made any amendments to the motion necessary for adequate presentation of any defects in those proceedings." *Id.*

¶ 72  Strict compliance with Rule 604(d) is required. *Gray*, 2023 IL App (4th) 230076, ¶ 30. Even when counsel files a facially valid Rule 604(d) certificate, a reviewing court may nevertheless consult the record to determine whether he or she actually fulfilled his or her obligations under the rule. *People v. Bridges*, 2017 IL App (2d) 150718, ¶ 8. When counsel has failed to comply with the requirements of the rule, a reviewing court must remand the case to the trial court for the filing of a new motion to withdraw and a new hearing on the motion. *People v. Grice*, 371 Ill. App. 3d 813, 815 (2007).

¶ 73　　　　We review the issue of counsel's compliance with Rule 604(d) *de novo*. *Id.*

¶ 74　　　　　　　　　　　　　2. *This Case*

¶ 75　　　　Defendant argues that post-guilty plea counsel failed to present his claims of error in his motion to withdraw, despite filing a facially compliant Rule 604(d) certificate. Defendant specifically refers to the motion's lack of citation to authority for his claims of error as showing it was deficient—namely, "Counsel's boilerplate motion did not clarify the legal or factual underpinnings of [defendant's] claim."

¶ 76　　　　Although, as the State concedes, defense counsel's motion failed to include any citation to legal authority or specific factual allegations underpinning the claims, we agree with the State that this case is similar to *People v. Brown*, 2023 IL App (4th) 220573, and warrants the same result.

¶ 77　　　　In *Brown*, the defendant, *pro se*, filed a bare-bones motion, very similar to the one at issue here, alleging ineffective assistance of counsel, which counsel adopted in its entirety. *Id.* ¶ 35. The trial court rejected the defendant's claim, and he appealed. *Id.* ¶¶ 22-23. On appeal, the appellate court noted that the defendant was given a full and fair evidentiary hearing to present his claim, at which he was able to testify to the key issues and evidence. *Id.* ¶ 33. The appellate court held that remand was not required, writing, "Where postplea counsel files a facially compliant Rule 604(d) certificate and the trial court determines after a full and fair hearing that the defendant's claims are meritless, defects in the pleadings do not justify a remand for further proceedings." *Id.* ¶ 50.

¶ 78　　　　Like in *Brown*, defendant in the present case was able to testify at length regarding his three claims—namely (1) his guilty plea was not voluntary, (2) he did not understand the consequences of his guilty plea, and (3) he was innocent. At that hearing, the

interpreter who translated at his guilty plea hearing also testified and was available for cross-examination. Defendant testified that he did not understand the immigration consequences of his guilty plea. He explained at length his problems with the jail conditions. He explained the difficulty he had understanding the female interpreter at his guilty plea hearing compared to the male interpreter he had received assistance from before. Defendant testified regarding his difficulty understanding the immigration consequences of his guilty plea and his difficulty understanding the interpreter at that hearing. However, defendant also testified that he generally understood the court's admonitions and had the ability to understand English.

¶ 79    In short, the record of the motion to withdraw the guilty plea hearing shows that the issues in his motion were fully developed, and any deficiency in the pleadings had no effect on its outcome. Any remand to more fully flesh out the motion to withdraw the guilty plea where the claims have already been adjudicated meritless "would be an exercise in futility and a waste of judicial resources." *Id.*

¶ 80                    C. Proceeding Without an Interpreter

¶ 81    Defendant next argues that the trial court erred by allowing the motion to withdraw the guilty plea hearing to proceed without an interpreter for defendant, thereby denying him his sixth amendment (U.S. Const., amend. VI) right to be "present" at all critical stages of the proceedings. We disagree.

¶ 82                    1. *The Applicable Law and the Standard of Review*

¶ 83    "A person's right to an opportunity to be heard in his or her defense is basic in our system of jurisprudence." *People v. Argueta*, 2015 IL App (1st) 123393, ¶ 32. "Without the aid of an interpreter, a defendant who speaks only a foreign language or with limited English proficiency, while having a physical presence in the courtroom, lacks a mental presence by his or

her inability to understand or participate meaningfully in the proceedings." *Id.*

¶ 84    If a defendant does not speak English, section 1 of the Criminal Proceeding Interpreter Act (725 ILCS 140/1 (West 2024)) provides for the appointment of an interpreter as follows:

> "Whenever any person accused of committing a felony or misdemeanor is to be tried in any court of this State, the court shall upon its own motion or that of defense or prosecution determine whether the accused is capable of understanding the English language and is capable of expressing himself in the English language so as to be understood directly by counsel, court or jury. If the court finds the accused incapable of so understanding or so expressing himself, the court shall appoint an interpreter for the accused whom he can understand and who can understand him."

¶ 85    "The availability of the language assistance of an interpreter lies within the discretion of the trial court." *Argueta*, 2015 IL App (1st) 123393, ¶ 33. The court must consider "the factual question of whether an interpreter is needed; a trial court does not have the discretion to deny an interpreter to a defendant who needs one." *People v. Raczkowski*, 359 Ill. App. 3d 494, 498 (2005). "Where an abuse of that discretion deprives [the] defendant of a basic right, a conviction will be reversed." *People v. Rivera*, 72 Ill. App. 3d 1027, 1039 (1979). "An abuse of discretion may be shown when it appears from the record that the witness was not 'understandable,' 'comprehensible' or 'intelligible' such that the lack of an interpreter deprived [the] defendant of a basic right." *People v. Bragg*, 68 Ill. App. 3d 622, 630 (1979). "The trial judge sits in the best position to assess the witness's facility with the English language." *Argueta*, 2015 IL App (1st) 123393, ¶ 34.

¶ 86                                        2. *This Case*

¶ 87            Defendant argues he should not have been allowed to proceed without the aid of

an interpreter at the hearing on his motion to withdraw his guilty plea. He contends the trial court

erred by failing to ascertain whether he needed an interpreter or why his counsel chose to

proceed without one, despite an interpreter being available.

¶ 88            Defendant compares his case to *People v. Williams*, 331 Ill. App. 3d 662, 664

(2002), where the trial court did not make any inquiry into a hearing-impaired defendant's ability

to understand the trial testimony. *Williams* held that once a trial court learns that a defendant

suffers from a hearing impairment, "the court must inquire into the nature and extent of the

impairment, so that the court can determine the accommodations reasonably necessary to protect

the defendant's right to confront the witnesses against him and participate in his defense." *Id.* at

667.

¶ 89            However, unlike the defendant in *Williams*, defendant here had already been

assisted by an interpreter throughout the proceedings. At the motion to withdraw hearing, the

trial court specifically admonished defendant that an interpreter was on standby prior to his

testimony. Despite having an interpreter on standby, defendant never requested the interpreter's

assistance, and nothing in his testimony suggested he needed any assistance to express himself.

¶ 90            By affirmatively electing to move forward in this manner, defendant's claim falls

squarely within the doctrine of invited error. "Under the doctrine of invited error, an accused

may not request to proceed in one manner and then later contend on appeal that the course of

action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003).

¶ 91            To circumvent the doctrine of invited error, defendant alleges that defense counsel

provided ineffective assistance. We review claims of ineffective assistance of counsel under the

standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Jones*, 2023 IL 127810, ¶ 51. A defendant must establish both that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* In this context, prejudice requires a reasonable probability that the outcome of the motion to withdraw the plea would have been different. See *People v. Tejada-Soto*, 2012 IL App (2d) 110188, ¶ 17.

¶ 92        Defendant argues that defense counsel's decision to allow him to testify without the aid of an interpreter was deficient because it undermined a central claim of his motion—namely, that he did not understand the trial court's immigration admonitions at the guilty plea hearing because of his lack of understanding of English. Defendant further contends that his limited English-speaking abilities prevented him from properly articulating his claims at the hearing, creating a reasonable likelihood that the outcome would have been different had an interpreter been used.

¶ 93        We disagree that defendant received ineffective assistance of counsel. The record suggests that counsel's decision was a matter of sound strategy. See *Jones*, 2023 IL 127810, ¶ 51 (holding that generally, matters of trial strategy are immune from claims of ineffective assistance of counsel). Defendant himself, at the motion to withdraw hearing, affirmed that the interpreter's presence sometimes made it *more difficult* for him to understand the proceedings due to the cross talk of simultaneous translation. Indeed, his testimony regarding his claim that he did not understand the consequences of his guilty plea was primarily based not on his lack of English proficiency, but on the interpreter's style and manner of giving defendant translations. Bypassing the interpreter allowed defendant to communicate directly with the court, which his testimony

showed he was very capable of doing. See *People v. Argueta*, 2015 IL App (1st) 123393, ¶ 50 ("[The defendant] was capable of testifying in English, and the record supports this conclusion. We find no abuse of discretion.").

¶ 94        Defendant quotes *People v. Cruz*, 372 Ill. App. 3d 556, 561 (2007), and argues that he was unlikely to object to counsel's choice for him to testify without an interpreter because " 'when a non-English-speaking defendant is naturally timid or reticent, the daunting nature of a criminal proceeding might stifle any impulse to express dissatisfaction with the interpreter.' " However, defendant here had already demonstrated his willingness to advocate on his own behalf regarding interpreter services. In February 2024, at an earlier hearing on a motion to continue, the trial court suggested defendant could attempt to speak without the aid of an interpreter, stating as follows:

> "I tell you what, I'll do it in English and [Mujica-Ruiz] will be here just standing by, and if you have a question, just raise your hand and stop me and then you can talk to her. Okay? Otherwise, I'd be happy to have you—she's here. She can do live interpreting if you'd like. What do you want to do?"

¶ 95        In response, defendant explicitly stated he wanted an interpreter, and the hearing proceeded with the aid of the interpreter. Nonetheless, at the motion to withdraw hearing, despite the trial court noting an interpreter was on standby, defendant never requested assistance and proceeded entirely in English. See *id.* ("[The defendant's] failure to object sooner [than after receiving a sentence] is a factor that weighs heavily against a claim of inadequate comprehension.").

¶ 96        Ultimately, defendant was able to adequately describe his issues with the guilty plea hearing. His assertion that the interpreter caused problems at that hearing was specifically

refuted by the interpreter's own testimony, as well as the trial court's findings that defendant understood the terms and ramifications of the plea agreement. Furthermore, defendant fails to identify what, if anything, he actually failed to understand or how the lack of an interpreter prevented him from testifying adequately. Consequently, we conclude no reasonable probability exists that using an interpreter at the motion hearing would have led the court to grant his request to withdraw his guilty plea.

¶ 97                                    III. CONCLUSION

¶ 98            For the reasons stated, we affirm the trial court's judgment.

¶ 99            Affirmed.